

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DSS:JPL/RMT
F.#2012R01575

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 1, 2013

<u>By Hand and ECF</u>

The Honorable Carol Bagley Amon
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:  United States v. Quazi Mohammad Rezwanul Ahsan Nafis
            <u>Criminal Docket No. 12-720 (CBA)</u>

Dear Chief Judge Amon:

      On February 7, 2013, the defendant pleaded guilty before Your Honor to Count One of the Indictment, which charged him with attempting to use a weapon of mass destruction, in violation of Title 18, United States Code, Section 2332a(a).  In short, the defendant attempted to detonate a large bomb outside the New York Federal Reserve Bank, and thereby commit mass-murder, to wage jihad and send a political message to the American people.  The defendant faces a statutory maximum term of life imprisonment.  The government respectfully submits this letter in advance of the defendant's sentencing, which is scheduled for August 9, 2013.  The government has also filed a letter in response to the defendant's sentencing letter, which was filed under seal on July 25, 2013.  Accordingly, the government filed its response to the defendant's letter under seal.

I.    <u>Summary of the Offense Conduct</u>

      The defendant Quazi Mohammad Rezwanul Ahsan Nafis (hereinafter "Nafis") is a Bangladeshi citizen who entered the United States from Bangladesh on a student visa in January 2012. Prior to traveling to the United States, Nafis formed strong anti-American views.  Nafis believed, among other things, that the United States was responsible for killing and raping Muslims all over the world.  He also believed that the United States used its economic power to make puppets of governments in Muslim countries.  While in Bangladesh, Nafis decided to take action

based on his religious and political views.  According to recorded statements, which Nafis repeatedly made during the course of the investigation, he came to the United States for the specific purpose of conducting a terrorist attack.[1]  To this end, prior to coming to the United States, Nafis acquired operable bomb-making instructions and brought these instructions with him to the United States.  He also brought lectures from Anwar al-Awlaki, the deceased leader of al-Qaeda in the Arabian Peninsula ("AQAP").[2]

Within months of arriving in the United States, Nafis used and attempted to use the internet to recruit like-minded individuals to help him carry out a terrorist attack.[3]  One of the individuals Nafis contacted was a radical Islamist known to Nafis as Yaqueen.[4]  Yaqueen proposed attacking a military base in Baltimore that he was familiar with, but Nafis insisted that the target of the attack would need to have a higher public profile to be effective.  Nafis indicated that he wanted his attack to result in "mass destruction" without regard to whether the victims were military or civilian.  Nafis also contacted another individual in the United States known to Nafis as Fahim.  Nafis repeatedly attempted to recruit Fahim to participate in a terrorist attack, but Fahim declined to join Nafis's plan.  Nafis also reached out to individuals overseas to assist him in his plan.  In recorded statements, Nafis reported that he had contacts overseas, including al-Qaeda members, who could assist him in carrying out a terrorist attack.  The government respectfully submits that it is important to note Yaqueen, Fahim, and the individuals Nafis made contact with overseas were not

---

[1]  Additional information concerning Nafis's state of mind at the time he traveled to the United States is set forth in the government's sealed letter.

[2]  On January 19, 2010, the Secretary of State designated AQAP as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act, as amended.

[3]  Nafis traveled to Missouri in January 2012, where he was enrolled in school to study cyber-security, but moved to New York City in May 2012.  After moving to New York, Nafis transferred to a local school.  According to Nafis's recorded statements, he enrolled in school to maintain his visa status while he planned how to carry out his jihad.

[4]  Yaqueen is currently detained and charged with non-terrorism related crimes.

2

government actors.  Nafis took these steps on his own initiative, motivated by his desire to conduct a terrorist attack.  This was a real plan that Nafis himself set in motion.

Fortunately, Nafis reached out to an FBI confidential human source ("CHS") through the internet to recruit the CHS into his (Nafis's) jihadist cell.  Again, the government respectfully submits that it is important to note that Nafis took the initiative to contact and follow-up with the CHS.  Nafis believed the CHS was a like-minded radical.  Nafis told the CHS that he admired Osama bin Laden and described the United States as "dar al-harb," which means "land of war" in Arabic.  Nafis specifically told the CHS that he traveled to the United States to wage jihad.  Nafis also told the CHS that he was in contact with a "brother" in Bangladesh.  Nafis discussed becoming a martyr with the CHS, and told the CHS that he (Nafis) had obtained an Islamic ruling from an individual in Bangladesh blessing his plan to conduct a terrorist attack inside the United States.

Based on, among other things, Nafis's aggressive attempts to recruit radical individuals into a jihadist cell, his statements concerning his intentions to conduct a terrorist attack, his connections overseas, and indications that he possessed bomb-making instructions (which later proved correct), the FBI, in consultation with this Office, decided to conduct a sting operation.  In this way, the FBI could protect the public from the actual terrorist attack planned by Nafis, while collecting admissible evidence of Nafis's crimes.  To have done otherwise would have placed the national security of the United States, and the lives of countless people, at risk.

Pursuant to the sting operation, the CHS offered Nafis an opportunity to meet with an al-Qaeda facilitator in the United States who could help carry out his plan, if he so wished.  Nafis eagerly and emphatically expressed his desire to meet with this purported al-Qaeda facilitator.  Nafis was told to contact the purported al-Qaeda facilitator only if he was ready to carry-out a terrorist attack.  Nafis indicated he was ready and took the step of contacting the purported al-Qaeda facilitator.  In no uncertain terms, Nafis stated that he wanted assistance from al-Qaeda in launching a terrorist attack in the United States.

On July 19, 2012, an undercover law enforcement officer posing as an al-Qaeda member and facilitator (the "UC"), spoke with Nafis and arranged a meeting in Central Park several days later.  On July 24, 2012, Nafis met the UC in Central Park. During that meeting, Nafis told the UC, in sum and substance,

3

that he wished to launch a terrorist attack against the United States.  Nafis further told the UC, in sum and substance, that he was collaborating with two other individuals -- Yaqueen and the CHS -- and that those individuals also wanted to participate in the attack.  Nafis stated, "We are ready for action."  Nafis then said, in sum and substance, that he, Yaqueen and the CHS "don't care anything about our work.  We just want to meet our lord as soon as we can."  Nafis continued:

> What I really mean, is that I don't want something that's like, small.  I just want something big.  Something very big.  Very very very very big, that will shake the whole country, that will make America, not one step ahead, change of policy, and make one step ahead, for the Muslims . . . that will make us one step closer to run the whole world . . . .

On August 5, 2012, Nafis told the UC, in sum and substance, that Nafis was considering the New York Stock Exchange as a possible target.  On August 9, 2012, FBI agents conducting surveillance of Nafis observed him in the area of the Stock Exchange, apparently as part of Nafis's efforts to assess its suitability as a target.  Surveillance agents also observed Nafis appearing to take notes while he was in the area of the Stock Exchange.

On August 11, 2012, Nafis met with the UC in a hotel room in Queens, New York.  During that meeting, Nafis confirmed that he wanted to target the financial district of Manhattan -- specifically, the New York Stock Exchange.  Nafis told the UC, in sum and substance, that he wanted to use explosives as part of a suicide attack, either contained in one or more cars, or strapped to his person.  Nafis explained, "We are going to need a lot of TNT or dynamite."  Nafis also provided the UC with a handwritten map of the area that Nafis had apparently prepared while scouting the area around the Stock Exchange on August 9, 2012. Nafis asked the UC whether approval for Nafis's proposed attack would come from the "top" of the al-Qaeda leadership.  The UC responded, in sum and substance, that he was going to meet with al-Qaeda leadership and advise them about Nafis's plan.  Nafis and the UC then traveled to the financial district in Manhattan, and Nafis took several photographs of prospective targets in that area.

On August 23, 2012, Nafis again met with the UC in a hotel room in Queens, New York.  Just a few minutes after arriving at that meeting, Nafis asked, "The thing that I want to

4

ask you about is that, the thing that I'm doing, is it under al-Qaeda?" The UC responded in the affirmative. The UC subsequently asked Nafis what Nafis needed to carry out his proposed attack, and Nafis explained that he needed a "big car with lots of fruits and vegetables in there which can blow up the whole New York Stock Exchange building." Nafis added that he needed "to make sure that this building is gone." Nafis told the UC that he understood and was committed to al-Qaeda's ideology. Nafis also asked the UC why the UC did not join him in carrying out the attack. Nafis asked, "Can I ask you something? Why aren't you (inaudible) to drive the car yourself? Why don't you want to be shahid?"[5] The UC responded, in sum and substance, that it was his role to facilitate Nafis's attack. At the conclusion of that August 23, 2012 meeting, the UC advised Nafis that the UC was going to travel overseas to meet with al-Qaeda leadership to discuss Nafis's proposed attack. The UC further told Nafis that the UC would contact Nafis again when the UC returned.

On August 26, 2012, FBI agents performing surveillance again observed Nafis in the area of the financial district, apparently again for the purpose of scouting the location for his proposed attack.

The next day, on August 27, 2012, Nafis told the CHS that he believed that he (Nafis) was now a member of al-Qaeda and that they were obtaining final approvals for the attack from al-Qaeda leadership. Later during the same discussion, Nafis told the CHS, in sum and substance, that his upcoming attack was going to be a "one man job," indicating that Nafis did not want the CHS or Yaqueen to be directly involved in Nafis's attack on the financial district. Nafis and the CHS then discussed how the CHS and Yaqueen might launch their own attacks after Nafis's attack was complete.

On September 15, 2012, Nafis again met with the UC in a hotel room in Queens, New York. During that meeting, Nafis told the UC, in sum and substance, that he wanted to launch an attack on the financial district involving explosive devices in multiple cars with other individuals participating in the attack. Nafis also confirmed that he was ready to kill himself during the course of the attack, but indicated that he wanted to return to Bangladesh to see his family one last time to set his affairs in order. In addition, Nafis told the UC that, for operational reasons, he was considering attacking the Federal Reserve Bank

---

[5]  "Shahid" means martyr, or in this context suicide bomber.

instead of, or in addition to, the New York Stock Exchange.
Nafis also told the UC, in sum and substance, that he understood
that the attack he was planning would result in a large number of
civilian casualties, including of women and children, but still
wanted to proceed with the attack.

On September 20, 2012, Nafis once again told the UC
that he wanted to return to Bangladesh prior to launching his
suicide attack in the United States to set his affairs in order.
The UC responded, in sum and substance, that Nafis was free to
return to Bangladesh at any time, but that if he did so, he could
not participate in the attack due to security concerns. Nafis
reacted with frustration and anger to the UC's position. During
a subsequent telephone call on September 23, 2012, Nafis urged
the UC, in sum and substance, to remind the al-Qaeda leadership
both that Nafis had come up with the attack plan himself, and
that he had specifically traveled to the United States for the
purpose of conducting a terrorist attack.

On September 27, 2012, Nafis again met with the UC. At
the beginning of that meeting, the UC explained to Nafis, in sum
and substance, that the al-Qaeda leaders with whom the UC had
purportedly consulted at Nafis's request would not wait for Nafis
to return from Bangladesh before carrying out the attack due to
operational security concerns. However, they had authorized
Nafis to use a remote-controlled explosive device, rather than
launching a suicide attack. The UC explained that as a result,
Nafis could participate in the attack, if he so wished, and later
return to Bangladesh to set his affairs in order. The UC then
asked Nafis whether Nafis wanted to continue to move forward with
the plot, and Nafis repeatedly confirmed that he was committed to
carrying out an attack on the financial district. Indeed, Nafis
was excited by the new plan to detonate the explosive device
remotely because, he indicated, it would allow him to conduct
additional terrorist attacks on U.S. soil.

On October 4, 2012, Nafis and the UC met and traveled
to a warehouse in the Eastern District of New York (the
"Warehouse"). Prior to that meeting, Nafis had obtained numerous
items for use in the explosive device at the UC's request,
including batteries and other electrical components. During the
meeting, Nafis and the UC purchased additional components to
construct the explosive device, including large garbage bins to
contain the purported explosive material. Nafis told the UC, in
sum and substance, that they should return to the financial
district during their next meeting to finalize exactly how they
would carry out the attack and escape. Nafis told the UC: "We
need to make a very concrete plan." In addition, when the UC

6

asked whether Nafis was ready to proceed with the attack, Nafis responded: "There is nothing stopping me."

On October 12, 2012, Nafis and the UC met and transported what Nafis believed to be explosive material to the Warehouse. Upon arriving at the Warehouse, Nafis and the UC offloaded approximately twenty fifty-pound bags of this purported explosive material into a trailer. Nafis also gave the UC a tarp that he had previously purchased to cover the purported explosive device when it was placed in the van. Nafis also provided the UC with a thumb drive containing an article Nafis had written about his motivations for his attack. Nafis believed that this article would be published by Inspire magazine. In that article, Nafis included quotations from "[o]ur beloved Sheikh Osama bin Laden" to justify the fact that his plot likely involved the killing of women and children. Nafis also stated the following:

> all I had in my mind are how to destroy America . . . I came up to this conclusion that targeting America's economy is most efficient way to draw the path of obliteration of America as well as the path of establishment of Khilapha.

> I decided to attack the Federal Reserve bank of New York which is by far the largest (by assets), most active (by volume) and most influential of the 12 regional Federal Reserve Banks. New York Federal Reserve Bank implements monetary policy, supervises and regulates financial institutions and helps maintain the nation's payment systems.

Shortly after this October 12, 2012 meeting, Nafis called the UC and informed the UC that he had purchased a second mobile telephone that Nafis would use to place the cellular telephone call to trigger the detonator for the bomb.

On October 13, 2012, as previously suggested by Nafis, Nafis and the UC returned to the financial district so Nafis could scout the site for his upcoming attack. During the drive to the financial district, Nafis plugged the thumb drive into his computer and read aloud his article that he intended to be published in Inspire.

On October 15, 2012, the UC called Nafis and advised that they would be ready to proceed with the attack on October

17, 2012.  Nafis agreed and indicated, in sum and substance, that
he was eager to proceed with the attack on that day.  The next
evening, on October 16, 2012, Nafis called the UC and stated, in
sum and substance, that he wanted to "add something" to the
planned attack, and that he wanted the attack "to happen, no
matter what."

     In the early morning of October 17, 2012, Nafis and the
UC met and drove to the Warehouse in a van (the "Vehicle").
During this drive to the Warehouse, Nafis told the UC, in sum and
substance, that he had a "Plan B," which involved changing the
attack into a suicide bombing operation in the event that Nafis
believed the attack was about to be thwarted by police.  After
arriving at the Warehouse, Nafis assembled the purported one
thousand-pound explosive device, pouring the bags containing the
inert explosive material into the trash bins and placing them
inside the Vehicle.  He also installed components for the
purported detonator.  As Nafis and the UC prepared to leave the
Warehouse, Nafis collected the empty bags that had contained the
inert explosive material and placed them in the van.  Nafis then
told the UC, in sum and substance, that he was collecting the
extra bags because he believed that there might be residual
explosive materials in the bags that would contribute to the
strength of the anticipated detonation and kill more people.

     The UC then drove the Vehicle from the Warehouse with
Nafis in the passenger seat to the New York Federal Reserve Bank.
During this drive, Nafis explained that his jihadist views were
shaped, in part, by videotaped sermons of Anwar al-Awlaki.  In
addition, Nafis told the UC that he wanted to record a video
statement prior to detonating the device.  Before entering
Manhattan, Nafis armed the purported explosive device for
detonation by turning on the cellular phone to be used in the
detonator, installing the battery in the detonator and connecting
the wires linking the detonator to the purported explosive
materials.

     Upon arriving at the New York Federal Reserve Bank,
Nafis and the UC parked the Vehicle, exited, and walked to a
nearby hotel.  Once inside a room at the hotel, Nafis told the UC
to film a video statement Nafis wanted to make concerning the
attack. During a video-recorded statement to the American public,
Nafis stated: "We will not stop until we attain victory or
martyrdom."  While making his video statement, Nafis covered his
face, wore sunglasses, and disguised his voice.  After completing
the video, Nafis repeatedly attempted to detonate the purported
bomb by placing multiple telephone calls to the cellular
telephone which he had installed as the initiating device for the

detonator.  By placing these calls, Nafis was attempting to detonate the purported bomb inside the Vehicle, which was parked next to the New York Federal Reserve Bank.

II.  Guidelines Calculation

       In the plea agreement, the government estimated a Guidelines range of imprisonment of 360 months to life.  This range was predicated on a base offense level of 33, plus the 12-point terrorism enhancement, minus 3 points for Nafis's acceptance of responsibility as evidenced by his timely guilty plea.  This resulted in an estimated adjusted offense level of 42.  Due to the terrorism enhancement, Nafis's Criminal History Category is VI, even though this is his first conviction.  See U.S.S.G. § 3A1.4(a).

       The Probation Department calculated a Guidelines range of life imprisonment.  (PSR ¶¶ 52-62, 97).  To reach this range, the Probation Department included an additional 3-point enhancement because the Probation Department takes the position that Nafis's attempted terrorist attack qualified as a hate crime pursuant to U.S.S.G. § 3A1.1(a).  Specifically, the Probation Department noted that Nafis chose to target the Federal Reserve Bank because it was an American institution, and thus "selected . . . any property as the object of the offense of conviction because of the actual or perceived . . . .national origin . . . of any person[.]"  U.S.S.G. § 3A1.1(a).

       The government does not believe that proof beyond a reasonable doubt exists to support the application of the hate crime enhancement.  See U.S.S.G. § 3A1.1(a) (must prove hate crime enhancement beyond a reasonable doubt).  Accordingly, the government stands by the Guidelines calculation set forth in the plea agreement.  Thus both the government and Nafis agree that the Guidelines range of imprisonment is 360 months to life.

III.  Sentencing Factors Under 18 U.S.C. § 3553(a)

       The government respectfully submits that a substantial sentence is appropriate in light of the factors set forth in 18 U.S.C. § 3553(a).  Interpreting the Supreme Court's decision in United States v. Booker, the Second Circuit has held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)."  United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005).  "While district courts enjoy discretion following Booker, that discretion must be informed by the § 3553(a) factors; a district court cannot import its own

philosophy of sentencing if it is inconsistent with the § 3553(a) factors." Id. at 132 (internal quotation marks omitted).  In this case, the factors set forth by 18 U.S.C. § 3553(a) weigh in favor of a guidelines sentence.

> A.   The Nature and Circumstances of the Offense and the Need to Provide Just Punishment Weigh in Favor of a Sentence within the Guidelines Range

Nafis traveled to the United States with instructions to make an operable bomb, and within months of arriving, recruited and attempted to recruit like-minded jihadists to help carry out a terrorist attack.  Nafis devised a plan to commit mass murder in the name of his twisted version of Islam.  To further his goal, he conducted surveillance of his target in downtown Manhattan, all the while, as New York City Police Department camera footage of the area shows, families walked past Nafis and his target.  As Nafis made clear to the UC, he did not care if children were killed in his attack.  Nafis wanted "mass destruction," as he told Yaqueen, to help spread his political message.

Nafis left no doubt what his message was when he videotaped his statement immediately before attempting to detonate the bomb.  Nafis stated: "We will not stop until we attain victory or martyrdom."  As Nafis told the UC, he fully intended to carry out follow-on attacks after the Federal Reserve bombing.  He also wanted Yaqueen and the CHS to conduct their own coordinated attacks shortly after his attack on the Federal Reserve.  Perhaps most striking of all, after seeing people in the street going about their business, Nafis repeatedly dialed a cellular telephone hoping to detonate a bomb that would kill and maim these people who happened to be in the wrong place at the wrong time.  Immediately after his arrest, Nafis attempted to justify his heinous crime by citing American foreign policy in Yemen and Israel.

Given Nafis's demonstrated willingness to conduct a terrorist attack, his determination to do so, his overseas connections, and access to bomb-making instructions, the government respectfully submits that the truly exemplary work by the FBI, NYPD and other law enforcement partners at the Joint Terrorism Task Force in this case, were all that stood between the City of New York and a Boston Marathon-type attack by Nafis. The government respectfully submits that the nature and circumstances of this offense conduct and the need to provide just punishment, clearly weigh in favor of a Guidelines sentence.

B.   The History and Characteristics of the Defendant Weigh
     in Favor of a Guidelines Sentence

          The history and characteristics of this defendant weigh
in favor of a Guidelines sentence.  As set forth above, Nafis has
little respect for human life.  He seemingly was raised by
devoted parents who gave him an opportunity to go to college in
Bangladesh and the United States.  Rather than take advantage of
these opportunities, Nafis embraced jihad.  Even when Yaqueen
tried to limit attacks to military personnel if possible, Nafis
showed his character by insisting on mass destruction regardless
of civilian casualties, including children.  Moreover, on
multiple occasions, the UC invited Nafis to walk away from his
plan to carry out an attack.  For example, on September 27, 2012,
the UC told Nafis: "so I am gonna leave it to you, you can get up
and leave and you give me a...," to which Nafis interrupted: "I
am up for it [the attack], inshallah [god-willing]."  During that
same meeting, the UC asked Nafis: "Are you sure you want to do
this brother? [referring to Nafis's plan to bomb the Federal
Reserve], to which Nafis responded: "I am sure I want to do this,
until my last breath.  Allahu Akbar, Allahu Akbar, Allahu Akbar,
Allahu Akbar [God is Great]."  Most tellingly, when Nafis was
given a choice of traveling to Bangladesh to see his family, or
participating in the bombing of the Federal Reserve, he
emphatically chose to bomb the Federal Reserve.

          These characteristics show the defendant to be a
committed jihadist.  Thus, the government respectfully submits
that Nafis's history and characteristics weigh in favor of a
Guidelines sentence.

          However, in determining the appropriate sentence, the
Court may consider the information provided by Nafis to the
government in the months following his arrest, which is described
in more detail in the government's sealed letter.  While this
attempted cooperation did not result in substantial assistance,
the Court may nevertheless consider this information as part of
the defendant's history and characteristics pursuant to United
States v. Fernandez, 443 F.3d 19, 33 (2d Cir. 2006).

C.   The Need to Promote Respect for the Law and the Need
     for Deterrence Weigh in Favor of a Guidelines Sentence

          The government respectfully submits that a Guidelines
sentence is necessary for purposes of general and specific
deterrence and to promote respect for the law.

D.    Protecting the Public Requires a Guidelines Sentence

     This factor weighs heavily in favor of a Guidelines
sentence.  After completing his sentence, Nafis will almost
certainly be deported.  Once outside the United States, Nafis
will be free once again to plot against U.S. interests around the
world.  During the course of the offense conduct in this case,
Nafis expressed an interest in potentially fighting jihad
overseas.  Accordingly, a Guidelines sentence will help to
protect the public from future crimes of this defendant.

E.    Providing the Defendant with Programs Is an
      Inconsequential Factor in the Instant Case

     The government respectfully suggests that any
determination regarding whether to provide Nafis with educational
or vocational programs should be left to the discretion of the
Bureau of Prisons.  However, since Nafis is likely to receive a
substantial sentence that will include sufficient time to enroll
in appropriate programs, this factor does not seem relevant to
the length of that sentence.

F.    The Need to Avoid Unwarranted Sentence Disparities
      Weighs in Favor of a Guidelines Sentence

     The need to avoid unwarranted sentencing disparities
weighs in favor of a guidelines sentence.  While the government
recognizes that each defendant presents a unique set of
considerations for the sentencing court, similarly situated
defendants to Nafis have received sentences within or near the
Guidelines range in this case.  For example, in this courthouse,
three defendants were sentenced to life imprisonment after trial
for attempting to blow up the fuel lines at JFK Airport during an
FBI source operation.  See United States v. Defreitas, 07-CR-543
(DLI) (E.D.N.Y. March 11, 2011) (life imprisonment); United
States v. Ibrahim, 07-CR-543 (DLI) (E.D.N.Y. Feb. 24, 2012)
(same); United States v. Kadir, 07-CR-543 (DLI) (E.D.N.Y. Jan.
18, 2011) (same).  In the Eastern District of Virginia, the
defendant Amine Mohamed El-Khalifi was sentenced to 30 years'
imprisonment after a sting operation during which he attempted to
attack the United States Capitol Building with an automatic
weapon and suicide bomb vest.  See United States v. El-Khalifi,
12-CR-37 (E.D. Va. Sep. 14, 2012).  In the Northern District of
Illinois, Derrick Shareef was sentenced to a term of 35 years'
imprisonment after pleading guilty to attempted use of weapons of
mass destruction.  Shareef was involved in a plot to detonate
explosives at a mall near Rockford, Illinois.  See United States
v. Shareef, 10-CR-7860, 2011 WL 1838876, at *1 (N.D. Ill. May 13,

2011).  See also United States v. Finton; 09-CR-30098 (DRH) (C.D. Ill. May 9, 2011)(defendant sentenced to 28 years pursuant to a Rule 11(c)(1)(C) plea for attempting to detonate a truck bomb). Accordingly, the need to avoid unwarranted sentencing disparities weighs in favor of a Guidelines sentence.

G.   Other Factors

None of the other factors identified in § 3553(a) is applicable to the case at hand.  See 18 U.S.C. § 3553(a)(3) ("the kinds of sentences available"); § 3553(a)(5) ("any pertinent policy statement"); § 3553(a)(7) ("need to provide restitution").

IV.  Conclusion

For the foregoing reasons, the Court should sentence the defendant within the applicable Guidelines range of 360 months to life imprisonment.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney


By:  _____/s/_____
     James P. Loonam
     Richard M. Tucker
     Assistant U.S. Attorneys
     (718) 254-7520/6204

cc:  Clerk of Court (CBA) (by ECF)
     Heidi Cesare, Esq. (by ECF)
     Michael Dorra, Probation Department (by ECF)