**Federal Defenders**
OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza - 16th Floor, Brooklyn, NY, 11201
Tel: (718) 330-1200  Fax: (718) 855-0760

*David E. Patton*
Executive Director and
Attorney-in-Chief

*Eastern District*
Peter Kirchheimer
Attorney-in-Charge

<u>Corrected and Filed under Seal</u>                    July 25, 2013

The Honorable Carol Bagley Amon
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

**RE:     United States v. Quazi Mohammad Rezwanul Ahsan Nafis, 12-CR-720 (CBA)**

Your Honor:

I write on behalf of Mr. Quazi Mohammad Rezwanul Ahsan Nafis ("Nafis") who is currently scheduled to be sentenced on Friday, August 9, 2013 at 9:30 am.

Please note that we have a number of objections to the PSR which have not been resolved to our satisfaction by the filing of the Addendum to the PSR.  In addition to our objections to the PSR and Addendum, we wish to advise the Court that we move for a variance below the advisory guidelines pursuant to 18 U.S.C. §3553(a) on the following combined grounds:  (1)  Nafis was uniquely vulnerable to radical influences due to his psychiatric disorders of stuttering, depression, dysthymia, and post traumatic stress; (2)  Nafis is profoundly remorseful for his behavior as is evidenced by his significant, prompt, and good faith attempt to cooperate with the government; (3) a nationwide review reveals that district courts have granted variances in all substantially similar cases.

<u>Objections to the PSR and Addendum</u>

¶¶4 and 5:  We object to and move to strike the content of these paragraphs on the ground that they misleadingly suggest that  Nafis had an association with al-Qaeda.  We further move to add the statement: "The defendant is not and never was a member of al-Qaeda."

Page 1 of  15

¶6: We object and move to strike the phrase "jihadist cell" from the first sentence of this paragraph. We object on the ground that this is a vague and inflammatory phrase that incorrectly suggests that Nafis was part of a terrorist organization. We propose that the phrase "jihadist cell" be replaced with the word "conspiracy".

¶12: We request that this paragraph be amended for accuracy as follows: "... in the early morning hours of July 12, 2012, the defendant *falsely claimed to* the co-conspirator and the source that [he] had contacts with al-Qaeda members overseas who could assist the group in planning and executing an attack on the high ranking official." *(Italics indicate the proposed amended language)*.

¶13: We request that this paragraph be amended for accuracy as follows: "On July 14, 2012, the defendant told the source that the defendant intended to return to Bangladesh, likely in December 2012, *falsely claiming that he was returning* to obtain training from al-Qaeda." *(Italics indicate the proposed amended language)*.

¶54: The defense objects to the proposed victim related adjustment under USSG §3A1.1(a). The plea agreement, which reflects the government's best analysis of the application of the USSG to the unique facts of this case, does not contemplate or recommend this upward adjustment. We also believe that this adjustment is inappropriate. Nafis did not select "any victim or property as the object of the offense of conviction because of ... national origin". USSG §3A1.1(a). Rather, he selected the Federal Reserve Bank because his intention was to target the financial district in downtown Manhattan. Nafis was indiscriminate with regard to the national origin or any other aspect of the persons who would have been injured had the bombing been successful. He was aware that were his attack successful, death and injury would occur to many persons regardless of race, color, religion, national origin, ethnicity, gender, or age.

Notably, this upward adjustment does not appear to have been applied in the four substantially similar FBI-sting bomb plots discussed below. *See e.g.*, Transcript of Sentencing Vol 2 Proceedings at 99, *U.S. v. Smadi*, no 3:09-cr-294 (N.D. Tex. Feb. 28, 2011), ECF no. 96; Plea Agreement, *U.S. v. Finton*, no 3:10-cr-30215 (C.D. Ill. May 9, 2011), ECF no. 76; Plea Agreement at 1, *U.S. v. Martinez*, no. 1:10-cr-00798-JFM (D. Md. Jan. 26, 2012), ECF no. 77; and Plea Agreement at 10, *U.S v. Hassoun*, no. 1:10 Cr 00773-1, (N.D. Ill. Apr. 23, 2012), ECF no. 64, p. 9-10.

¶58: The defense objects to the "adjusted offense level" calculation of 48. Per the commentary to USSG §3D1.3, n.1, "offense level" refers to "the offense level from Chapter Two after all adjustments from Parts A, B, and C of Chapter Three." Further, commentary to the Sentencing Table, *see* n.2, provides that, "an offense level of more than 43 is to be treated as an offense level of 43."

¶78: We object and move to strike the phrase that Nafis is "not legally in the United States" on the ground that it is inaccurate. A correct description of Nafis' status in the United States is as

follows.   Nafis came to the United States in January 2012 pursuant to a non-immigrant student visa.  Since October 2012 he has been detained by the United States for purposes of prosecution and punishment.  Once he has served his sentence he will be subject to removal proceedings.

¶¶62, 97:  Consistent with our objection to ¶¶54 and 58, we believe that (1) the total offense level should be 40 not 45, and (2) the advisory guideline range should be 360 months to life.

¶109:  We believe there is a basis for a sentence below the advisory guideline system under 18 U.S.C. §3553(a).  On October 18, 2012, one day after his arrest,  Nafis communicated through his counsel his wish to take responsibility for his actions and cooperate with the government. Thereafter, as soon as was feasible,  Nafis met with the government for a series of ongoing and lengthy proffer sessions.  He committed himself to a truthful and complete debriefing of his offense.  His information was credited by the government, but due to factors beyond  Nafis' control, his information has not been useful to the government to date.  Should  Nafis' information become useful to the government in the future,  Nafis remains willing to cooperate. Nafis' timely and diligent proffers, and his willingness to cooperate are strong evidence of his sincere remorse and determined efforts at rehabilitation.   Under section 3553(a)(1), district courts should consider "the contention that a defendant made efforts to cooperate, even if those efforts did not yield a Government motion for a downward departure pursuant to U.S.S.G. § 5K1.1." *United States v. Fernandez*, 443 F.3d 19, 33 (2006).

### Motion for a Variance below the Advisory Guideline Range
### (18 U.S.C. §3553(a))

**A.      Background**

Attached are a number of exhibits, marked A through L, which offer information about Nafis, the person.  The exhibits include Dr. Krueger's forensic psychiatric evaluation and report, and emails and letters from friends and family.



*Nafis with his sister*

Nafis is from Dhaka, Bangladesh.  He is now 22 years old.  He was raised in an intact middle class family.[1]  His father, Quazi Mohammad Ahsanullah, is a retired banker.[2]  His mother, Rokeya Siddiqui, who has degrees in psychology and education, is a homemaker.[3]  Nafis' only sibling, his sister, Fariel Bilkis, is a recently married medical doctor.[4] According to the family, Fariel was an obedient and studious child.  Nafis, four years younger, suffered in comparison.  He was neither as studious nor as obedient as his sister and this was a "difficult" for his parents.[5]

At home, Nafis was not allowed to leave his building or play with other children.  Indeed, he was generally not free to play.[6]  His mother felt that time should be spent studying, and that play time was a waste of time.[7]   Nafis' only play space was his bedroom and the roof of his building.[8]

---

[1]PSR, ¶71.

[2]Exhibit E.

[3]Exhibit C.

[4]Exhibit F.

[5]Exhibit B, p. 4.

[6]Exhibit D.

[7]Id.

[8]Id.



*Nafis, age 5, on roof of his building*

Nafis suffered a significant stammer in his childhood.[9] It was acute when he was six to seven years old. The stammer was so severe that he could not speak fluently.[10] His parents were concerned about the stammer and consulted with a speech therapist.[11] The problem, however, has never resolved completely.[12] Even now when he is excited or agitated he can not speak his mother language "Bangla" fluently.[13]

Due to the stammering, Nafis was teased by other children.[14] Nafis became introverted and reluctant to talk to others. Nafis did not have many friends in his young childhood and the stammering aggravated his loneliness.[15] Nafis recalls that he had no friends and no one to talk to.[16] His father recalls that Nafis spent most of his leisure time alone in his bed room.[17] As a result, Nafis was "depressed and sad and got isolated and alone."[18] Nafis recalls that as a child he was extremely shy and lonely. He was unhappy, and felt hopeless, from an early age.[19]

Nafis' primary caretaker parent was his mother. His mother, though well intentioned, was a strict and impatient parent. She regularly beat her son, whipping him with a rod, for failure to listen and other similar indiscretions. She would hit him with her hands, and sometimes whipped him with a rod. Even when she did not actually whip him would always brandish the rod and threaten to

---

[9]PSR, ¶71; Exhibits A, C and D.

[10]Id.

[11]Exhibit D.

[12]Exhibit A.

[13]Exhibit D.

[14]Id.

[15]Exhibits A, p.3., C, and D.

[16]Exhibit A, p.3.

[17]Exhibit D.

[18]Id.

[19]Exhibit A, p. 4.

whip him.   Nafis' mother continuously castigated Nafis voicing disappointment, criticism, and disapproval.[20]  This verbal haranguing and the constant threat of severe corporal punishment created an atmosphere of fear and undermined Nafis' sense of self esteem.[21]

In one incident particularly recalled by Nafis' parents, when Nafis was six or seven years old, Nafis' mother lost her temper and severely beat him.  Nafis was so traumatized by the beating that he stopped talking.  Concerned, his mother consulted a physician.  The doctor told Nafis' mother to stop physical punishments.  Despite this advice, this cycle of severe punishment followed by muteness was repeated several times during Nafis' childhood.[22]

Nafis' father spent less time with his son, but he, too, practiced violent corporal punishment.  On one occasion, Nafis' father lost his temper so completely and beat his son in such a frightening manor, that young Nafis urinated in his pants.[23]  Ever after that incident,  Nafis was afraid of his father and always tried to hide from him.[24]



*Nafis with family*



[20]PSR, ¶72; Exhibit A, p. 4, 8.

[21]PSR, ¶72.

[22]Exhibit B.

[23]PSR, ¶72.

[24]Exhibit A, p. 4.



For grammar school and high school Nafis went to the Ideal School and College, a highly regarded private aschool. According to his parents, Nafis showed little interest in studying.[29] Nafis' parents, who had "middle class" point of view, felt that above all study was absolutely necessary to achieve a prosperous life.[30]

Nafis' mother was extremely anxious about Nafis' studies. She felt like time spent on anything other than study was a waste of time. Nafis' mother believed that by keeping him under supervision at all times, she could keep him out of harm's way. Nafis' mother took Nafis to school and brought him home from school every day, and she would wait for him at school while he attended his classes. This continued until Nafis went to University.[31]



*Fariel and Nafis*

Nafis was graduated from high school in 2008 when he was seventeen years old. In or about 2009 when he was eighteen yesrs old, Nafis had a brief relationship with a girl which ended in a breakup.[32] According to Nafis as well as his cousin, Arif, Nafis was extremely upset about the break up.[33] Arif recalls that Nafis was depressed for months afterward.[34] Nafis became lonely and easily agitated. He complained he could not find any meaning in his life.[35] Nafis' parents recall that Nafis was frustrated and confused but attributed these feelings to his failure to get into his first choice university.[36] Nafis' mother thought he should see a therapist,

---

[28]

[29] Exhibit B.

[30] Id.

[31] Id.

[32] Exhibit A, p.4.

[33] Exhibits A, p. 4, and B.

[34] Exhibit B.

[35] Id.

[36] Exhibits B and D.

but no one ever followed up on the idea.[37]  Both of Nafis' parents recall Nafis saying that he wanted to kill himself but they did not take these statements seriously.[38]

Nafis' parents did not allow him to have any freedom or make any decisions for himself until he was 18 or 19 years old.[39]  The family believes that these restrictions made him "angry on the inside".[40]  Nafis' mother recalls that when he went to North South University in Dhaka, Bangladesh he seemed to suffer from an inferiority complex.[41]  Nafis was a succesful high school student[42] but his grades failed in university.[43]

At university Nafis was befriended by the more active and outgoing "religious" boys.[44]  Some of these students believed in radical islam and promoted the ideology to Nafis. Nafis was gratified by the attention of these new friends and he began to adopt their radical views.  At the same time, he was continuing to flunk his university classes and was feeling like a failure.[45]

In January 2012, Nafis came to the United States to study at South Eastern Missouri University ("SEMU").  He dropped out after one semester and moved to New York.  During his time at SEMU and in New York, Nafis became depressed again.  He spent many hours, alone, on his computer, networking with people who espoused radical islam.  Through his online activites Nafis eventually met an informant, who connected him to an undercover FBI agent acting as an al-Qaeda operative.

---

[37]Exhibit B.

[38]Id.

[39]Exhibit B, p. 4.

[40]Id.

[41]Id.

[42]Addendum to PSR, ¶88.

[43]Exhibits A, p. 5, and B.

[44]Id.

[45]Exhibit A, p. 4 5.

**B.    Nafis was uniquely vulnerable to radical influences due to his psychiatric disorders.**

Nafis has met with Dr. Richard Krueger who performed a forensic psychiatric evaluation of Nafis.[46]  Dr. Krueger's impressions of Nafis are as follows.

Nafis, now 22 years old, is a young man from a middle class Bangladeshi family.  He developed stuttering at an early age, which was not sucessfully treated.  The stuttering caused him to be shunned by his peers.  At home, Nafis was subject to severe physical discipline and verbal castigation.  He was beaten by both his mother and father. ███████████████████████████████████████████████████████████████████████████ ███████    Both of these stressors, the severe corporal punishments and the ███████ resulted in the development of post traumatic stress disorder.  This condition has never been treated and continues to date.  Nafis became acutely depressed in 2009 after the breakup with a girlfriend.  Symptoms of this severe depression included failure to go to classes, severe suicidal ideation, and some psychotic experiences.  His suicidal ideation has waxed and waned since 2009.  In addition to major depression, Nafis has suffered dysthymia since approximately 12 or 13 years of age.[47]

Dr. Krueger found that Nafis's depression, dysthymia, post truamatic stress disorder, and stuttering made Nafis vulnerable to external influences of radicalized peers at the North South Univesity in Dhaka, Bangladesh.  Nafis saw these other students as happier and more effective that he was.  It was in this context that Nafis was befriended by radicalized students at the university.  These students promoted their radical ideology to Nafis, and contributed to his indoctrination.  In January 2102 Nafis came to the United States.  His depresson continued and worsened.  Nafis began spending more and more time by himself, viewing radical sermons, and networking over the internet with other Muslim radicals.  Nafis felt hopeless.  He felt "that he was never successful at anything" and he developed the notion of committing suicide through Jihad.  He thought that this would make his life meaningful. Nafis came upon the plan that Jihad would allow him to committ suicide in a fashion acceptable to his religion and also allow him to make his mark on the world by committing a severe act of terrorism againsthe United States.[48]

Dr. Kruefger's "Axis I" diagnosis are: (1) Major depression, single esisonde, with psychotic features, in partial remission; (2) dysthymia; (3) post traumatic stress disorder, chronic, severe; and (4) history of stuttering.  According ot Dr. Krueger, Nafis' depression is now in remission, and Nafis no longer suffers suicidal ideation.[49]

---

[46] *See* Exhibit A.

[47] Exhibit A, p. 8.

[48] Id.

[49] Exhibit A, p. 9.

**C.      Nafis is profoundly remorseful for his behavior as is evidenced by his significant, prompt, and good faith attempt to cooperate with the government.**

On October 18, 2012, one day after his arrest, Nafis communicated through his counsel his wish to take responsibility for his actions and cooperate with the government.  Thereafter, as soon as was feasible, Nafis met with the government for a series of ongoing and lengthy proffer sessions.  He committed himself to a truthful and complete debriefing of his offense.  His information was credited by the government, but due to factors beyond  Nafis' control, his information has not been useful to the government to date.  Should  Nafis' information become useful to the government in the future,  Nafis remains willing to cooperate.  Nafis' timely and diligent proffers, and his willingness to cooperate are strong evidence of his sincere remorse and determined efforts at rehabilitation.   Nafis has completely abondaonned his belief in radical islam.  Under section 3553(a)(1), district courts should consider "the contention that a defendant made efforts to cooperate, even if those efforts did not yield a Government motion for a downward departure pursuant to U.S.S.G. § 5K1.1." *United States v. Fernandez*, 443 F.3d 19, 33 (2006).

**D.      A nationwide review reveals that other courts have granted variances in all substantially similar cases.**

By our estimate, the advisory guideline range for this offense is 360 months to life.[50]   A guidelines sentence, however, would be significantly higher than sentences imposed in other substantially similar cases.  Under 18 U.S.C. § 3553(a)(6) the Court "shall consider ... the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." A court considering that need to avoid unwarranted disparities, in light of the sentences given nationwide to highly similar conduct, should sentence Nafis below the 30 years recommended by the advisory guidelines.

"Section 3553(a)(6) directs *district courts* to consider the need to avoid unwarranted disparities    along with other § 3553(a) factors    when imposing sentences." *Kimbrough v. U.S.*, 552 U.S. 85, 108 (2007)(*emphasis in original*).  Specifically, district courts must take account of sentencing practices in other courts." *Id.*  "Section 3553(a)(6) requires a district court to consider nationwide sentence disparities," *U.S. v. Frias*, 521 F. 3d 229, 235 (2d Cir. 2008), because 3553(a)(6) was intended "to eliminate disparities on a *national* level." *U.S. v. Trejda*, 146 F. 3d 84, 87 (2d Cir. 1998) (emphasis in original); *See also U.S. v. Newsom,* 399 Fed.Appx 625 (2d Cir. 2010); *U.S. v. Fernandez*, 443 F. 3d 19, n.9 (2d Cir. 2006).

The Second Circuit has established no single test for determining what constitutes unwarranted sentence disparity, but has identified a number of factors to be considered. Defendants must have the same level of culpability, role and conduct in the crime. *See U.S. v. Ebbers*, 458 F. 3d 110, 129 (2d Cir. 2006). Defendants must have similarly chosen to cooperate.

---

[50]Offense level 40, CHC VI.

*Id.* They must have similarly participated or not participated in a fast-track sentencing program. *See U.S. v. Mejia-Zapata*, 327 Fed.Appx 292 (2d Cir. 2009). They must have similarly pled guilty. *See U.S.v. Garcia*, 459 Fed.Appx 68 (2d Cir. 2012). They must have similarly apologized for their actions. *See U.S. v. Nouri*, 711 F. 3d 129 (2d. Cir. 2013).

In light of these precedents, we have identified seven criteria which we believe show substantially similar conduct.  The criteria are: (1) defendant was convicted of attempted possession of a weapon of mass destruction under 18 U.S.C. §2332a(a); (2) the defendant plead guilty; and (3) expressed remorse for his behavior;  (4)  the defendant intended to carry out an al Qaeda-inspired terrorist attack that would result in severe damage and loss of life; (5) the defendant was the target of  an FBI sting operation, (6) the defendant attempted to detonate an inert FBI-supplied bomb, and (7) at sentencing, the defendant did not have the benefit of a cooperation agreement with the government.

We have cast a wide net and reviewed all terrorism related indictments filed since the "9/11" terrorist attack on the World Trade Center.  In addition to standard legal research, our search surveyed major news outlets and official government sources for instances of terrorism prosecutions.[51]  While there are a large number of post-9/11 cases that could be considered terrorism-related[52], the vast majority of cases differ significantly in the charges, the conduct, the scope of damage or attempted damage.  Other defendants with very similar conduct and charges pled not guilty, raising entrapment or insanity defenses with varying degrees of success, and thus are not "similarly situated" for the purposes of comparison. *E.g., U.S. v. Cromite,* no. 7:09-cr-00558, 2010 WL 3025670 (S.D.N.Y Jul. 28, 2010) (sentenced to 25 years); *U.S. v. Feradus*, no. 1:11-cr-10331 (D. Mass. Nov. 1, 2012) (Sentenced to 17 years); *U.S. v. Mohamud,* no. 1:12-cr-00723 (D. Or. 2013) (yet to be sentenced). Some defendants plotted attacks that were multi-stage assaults, involving fire-arms and suicide vests. *E.g., U.S. v. El Khalifi,* no. 1:2012-cr-00037 (E.D.Va. Sep. 14, 2012); *U.S. v. Osmakac,* no. 8:12-cr-00045(M.D. Fl. 2013). Some defendants did not express remorse for their actions. *E.g., U.S. v. Shareef,* no. 1:06-cr-00919-1, 2011 WL 1838876 (N.D. Ill. May 23, 2011).  We considered, but excluded, all cases with significant legal differences that could warrant a disparity.

After a thorough search of all terrorism-related cases[53], excluding those that did not meet our strict criteria listed above, we have identified only four defendants who are similarly-situated for the purpose of analysis under § 3553(a)(6):

---

[53]*See*, E.g., Staff of S. Intelligence Comm., Terrorist Arrests and Plots Stopped in the United States 2009 2012. (Oct. 23, 2012), *available at* http://www.feinstein.senate.gov/public/index.cfm/files/serve/?File id adec6e10 68ed 4413 8934 3623edc62cef ; DEPT. OF JUSTICE, STATISTICS ON UNEASEALED INTERNATIONAL TERRORISM AND TERRORISM RELATED CONVICTIONS (Mar. 18, 2010), *available at* http://web.archive.org/web/20100530015008/http://www.justice.gov/cjs/docs/terrorism convictions statistics.pdf .

### 1.    *United States v. Smadi*, no. 3:09-cr-00294, (N.D. Tex.)

Hosam Smadi, 20, was captured through an FBI sting operation in the Northern District of Texas on September 24, 2009.[54] He came to the FBI's attention through his activity on extremist jihadi internet forums.[55]  He was contacted by undercover FBI agents posing as al-Qaeda operatives.[56] The FBI agents provided Smadi with an ersatz truck-bomb.[57] He attempted to detonate the bomb under a 60-story office building in Downtown Dallas.[58] He plead guilty to one count of attempted use of a weapon of mass destruction in violation of 18 U.S.C. §2332a(a).[59] He did not have a cooperation agreement with the government.[60]  Smadi's offense level under the guidelines was determined to be 43.[61] The court further found that with an offense level of 43, and a CHC of IV, the USSG advisory sentence range was life imprisonment.[62]  At his sentencing, Smadi expressed profound remorse for his actions.[63]  Smadi was sentenced to 24 years.[64]

### 2.    *United States v. Finton*, no.  3:10-cr-30215 (S.D. Ill.)

Michael C. Finton, 31, was captured through an FBI sting operation in the Central District of Illinois on September 23, 2009.[65] He came under FBI investigation after a search of his vehicle, resulting from a parole violation, turned up documents that investigators believed expressed an interest in jihad.[66] An undercover FBI agent posing as an Al Qaeda operative contacted Finton.[67] The FBI agent provided Finton with an ersatz van-bomb. He attempted to detonate the bomb at a Federal Building in Springfield, Illinois.[68] He plead guilty to one count of attempted use of a weapon of mass destruction in violation of 18 U.S.C. §2332(a).[69] He did not have a cooperation agreement with the government.[70] His offense level under the guidelines was

---

[54]Complaint at 1, U.S. v. Smadi, no. 3:09 cr 294 (N.D. Tex. Sep. 25, 2009), ECF no. 1

[55]Id. at 2.

[56]Id. at 3.

[57]Id. at 10.

[58]Factual resume, U.S. v. Smadi, no. 3:09 cr 294 (N.D. Tex. May 25, 2010), ECF no. 60.

[59]Plea Agreement, U.S. v. Smadi, no. 3:09 cr 294 (N.D. Tex. May 25, 2010), ECF no. 61.

[60]Transcript of Sentencing Vol 2 Proceedings at 99, U.S. v. Smadi, no 3:09 cr 294 (N.D. Tex. Feb. 28, 2011), ECF no. 96.

[61]Id.("Then the impact of the rulings that I have made with respect to the guidelines is that the offense level in this case is 43. . .Under the guidelines a person with an offense level of 43, and a criminal history category of VI, is subject to a life term.")

[62] Id.

[63] Transcript of Sentencing Vol 2 Proceedings at 122, U.S. v. Smadi, no 3:09 cr 294 (N.D. Tex. Feb. 28, 2011), ECF no. 96. ("Your Honor, I am so ashamed for what I did. I'm very sorry for my action. I'm guilty of being involved in this ugly, evil target and some people and womens and children.")

[64]Judgment at 2,  U.S. v. Smadi, no 3:09 cr 294 (N.D. Tex. Feb. 28, 2011), ECF no. 88.
[65]Complaint at 2, U.S. v. Finton, no 3:10 cr 30215 DRH (S.D. Ill. Nov. 29, 2010), ECF no. 2.

[66]Id.
[67]Id. at 10.

[68]Id. at 24.

[69]Plea Agreement, U.S. v. Finton, no 3:10 cr 30215 (C.D. Ill. May 9, 2011), ECF no. 76.
[70]Id.

determined to be 43. [71] With an offense level of 43, and a CHC of IV, the USSG advisory sentence range was life imprisonment.[72]  Finton was sentenced to 28 years. [73]

### 3.      *United States v. Martinez*, no. 1:10-cr-00798 (D. Md.)

Antonio Martinez, 22, was captured through an FBI sting operation in the District of Maryland on December 8, 2010.[74] He came to the FBI's attention after posting jihadi messages on his Facebook expressing a desire to be a mujahadin. [75] He contacted a confidential informant, who put him in contact with an FBI agent posing as an Al Qaeda operative.[76] The FBI agent provided Martinez with an ersatz SUV-bomb.[77] Martinez attempted to detonate the bomb at a Baltimore military office.[78] He plead guilty to one count of attempted use of a weapon of mass destruction in violation of 18 U.S.C. §2332a(a).[79] He did not have a cooperation agreement with the government.[80] At his sentencing, Martinez expressed profound remorse for his actions.[81] His offense level under the guidelines was determined to be 40. [82] With an offense level of 40 and a CHC ov IV, the USSG advisory sentence was 360 months to life.[83]  Martinez was sentenced to 25 years. [84]

### 4.      *United States v. Hassoun*, 1:10-cr-00773 (N.D. Ill.)

Sami Samir Hassoun, 25, was captured through an FBI sting operation in the Northern District of Illinois on September 19, 2010.[85] He came to the FBI's attention after he made statements to a confidential informant indicating a desire to carry out violent jihad.[86] He contacted undercover FBI agents posing as Al Qaeda operatives.[87] The FBI agents provided Hassoun with an ersatz backpack-bomb.[88] He attempted to detonate the bomb at a crowded downtown area outside Wrigley field in Chicago.[89] He plead guilty to one count each of

---

[71] Minute Entry at 1, U.S. v. Finton, no 3:10 cr 30215 (C.D. Ill. May 9, 2011), ECF no. 77.

[72] Plea Agreement, U.S. v. Finton, no 3:10 cr 30215 (C.D. Ill. May 9, 2011), ECF no. 76.

[73] Judgment, U.S. v. Finton, no 3:10 cr 30215 DRH (S.D. Ill. May 9, 2011), ECF no. 79.
[74] Complaint at 3, U.S. v. Martinez, no. 1:10 cr 00798 JFM (D. Md. Dec. 8, 2010), ECF no. 1.

[75] Id.

[76] Id.

[77] Id. at 17.

[78] Id.

[79] Plea Agreement at 1,  U.S. v. Martinez, no. 1:10 cr 00798 JFM (D. Md. Jan. 26, 2012), ECF no. 77.

[80] Id.

[81] Alex Dominguez, *Man in Recruiting Center Bomb Plot Gets 25 Years*, ASSOCIATED PRESS, Apr. 6 2012, *available at* http://news.yahoo.com/man recruiting center bomb plot gets 25 years 161120545.html. ("Martinez said in a lengthy apology that he knew little of Islam when he was arrested and "all I had was a religious zeal." Martinez repeatedly said that he has "renounced the misguidance of terrorism" and that the religion is not one "anyone in this courtroom should be afraid of."")

[82] Plea Agreement at 4,  U.S. v. Martinez, no. 1:10 cr 00798 JFM (D. Md. Jan. 26, 2012), ECF no. 77.
[83] Id.

[84] Judgment at 2,  U.S. v. Martinez, no. 1:10 cr 00798 JFM (D. Md. Apr. 6, 2012), ECF no. 89.
[85] Complaint at 3, U.S v. Hassoun, no. 1:10 Cr 00773 1 (N.D. Ill. Sep. 20, 2010), ECF no. 1.

[86] Id.
[87] Id at 11.

[88] Id at 22.

[89] Id.

attempted use of a weapon of mass destruction and attempted use of an explosive device in violation of 18 U.S.C. §2332a(a) and 18 U.S.C. § 844(I).[90] He did not have a cooperation agreement with the government.[91] At his sentencing, Hassoun expressed profound remorse for his actions.[92] His offense level under the guidelines was determined to be 46.[3][9]With an offense level of 46, and a CHC of IV, the USSG advisory sentence range was life.[94] Hassoun was sentenced in to 23 years.[95] years.

Like the defndants in *Smadi*, *Finton*, *Martinez*, and *Hassoun*, Nafis was captured through an FBI sting operation. He came to the FBI's attention by participating in jihadi discussions on Facebook. He contacted an undercover FBI agent who was posing as an Al Qaeda operative. The FBI agent provided Nafis with an ersatz van-bomb. Nafis attempted to detonate the bomb outside of the Federal Reserve building in Manhattan. He plead guilty to one count of attempted use of a weapon of mass destruction in violation of 18 U.S.C. §2332a(a), and he has no cooperation agreement with the government. Nafis, as shown by his attempts to cooperate and his expected remarks at sentencing, also feels profound remorse for his actions.

Of these four very similar cases, the highest sentence of 28 years was reserved for Finton, who had multiple prior offenses, including an assault and a robbery,[96] and the second highest sentence of 25 years was given to Martinez, who had a conviction for petty theft.[97] Nafis and the other two similar defendants have no prior convictions.[98] A guideline sentence of 30 years, or more, in the instant case would produce a significant disparity between this sentence and the sentences of the four similarly situated defendants. On this ground alone, the Court has good reason to grant a variance below the advisory guideline and impose a sentence significantly below 30 years in prison.

---

[90]Plea Agreement at 10, U.S v. Hassoun, no. 1:10 Cr 70073 1, (N.D. Ill. Apr. 23, 2012), ECF no. 64, p. 10 11.

[91]Id.

[92]Defendant's Sentencing Memorandum Exhibit 4, U.S v. Hassoun, no. 1:10 Cr 70073 1, (N.D. Ill. Mar. 13, 2013), ECF no. 84 ("I would like to sincerely apologize. Judge Gettleman, I am so ashamed of my actions and of this horrific crime that I've committed and the shame that I brought upon my family, my ethnicity. the country and the world.").

[93]Plea Agreement at 10, U.S v. Hassoun, no. 1:10 Cr 00773 1, (N.D. Ill. Apr. 23, 2012), ECF no. 64, p. 10 11.

[94]Id.

[95]Judgment, U.S v. Hassoun, no. 1:10 Cr 00773 1 (N.D. Ill. May 30, 2013), ECF no. 91.

[96] Mike Robinson, *Michael Finton Charged By FBI For Attempting To Bomb The Springfield Federal Courthouse*, ASSOCIATED PRESS, Sept. 24, 2009, *available at* *http://www.huffingtonpost.com/2009/09/24/michael finton charged by n 298669.html.*

[97] Don Markus and Andrea F. Seigel, *Man Accused in Bomb Plot Had Prior Criminal Charges*, BALTIMORE SUN, Dec. 10, 2010, *available at* http://articles.baltimoresun.com/2010 12 10/news/bs md martinez bomb plot 20101209 1 bomb plot car bomb du mmy bomb.

[98] Transcript of Sentencing Vol 2 Proceedings at 99, U.S. v. Smadi, no 3:09 cr 294 (N.D. Tex. Feb. 28, 2011), ECF no. 96.; Defendant's Sentencing Memorandum, U.S v. Hassoun, no. 1:10 Cr 70073 1, (N.D. Ill. Mar. 13, 2013), ECF no. 84 .

"The Guidelines, which *Booker* made effectively advisory. . .should be the starting point and the initial benchmark, but district courts may impose sentences within statutory limits based on appropriate consideration of all of the § 3553(a) factors." *Pepper v. U.S.*, 131 S.Ct. 1229, 1233 (2011). In light of the § 3553(a)(6) concerns raised by the nationwide sentencing practices for § 2332(a) violators, only a variance below the guidelines would meet the § 3553(a) requirement of a sentence that is "sufficient, but not greater than necessary."

### Conclusion

For the foregoing reasons, and any other reasons the Court deams just and proper, the defendant respectfully moves, pursusunt to 18 USC §3553(a), for a sentence significantly below 30 years.

Thank you for your attention.

Respectfully submitted,

*/s/ Heidi C. Cesare, Esq.*
Assistant Federal Defender
718-330-1257


enc.

cc:    Clerk of the court (by ECF)

       James Patrick Loonam, Esq., AUSA

       Richard M. Tucker, Esq., AUSA

       Michael Dorra, Senior USPO

       Quazi Nafis