

U.S. Department of Justice

_United States Attorney_
_Eastern District of New York_

DMP:RMT
F.#2012R01575

_271 Cadman Plaza East_
_Brooklyn, New York 11201_

July 27, 2018

By Hand Delivery and ECF

The Honorable Carol Bagley Amon
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Quazi Mohammad Rezwanul Ahsan Nafis
> Criminal Docket No. 12-720 (CBA)
> Civil Docket No. 18-2951 (CBA)

Dear Judge Amon:

The government respectfully submits this letter memorandum in response and opposition to the above-referenced defendant's May 11, 2018 petition pursuant to Title 28, United States Code, Section 2255, to have his conviction overturned or, in the alternative, to be resentenced. Because the defendant waived his right to collaterally attack his conviction, because his petition is untimely and procedurally barred, and because it is without merit, his claim should be denied and his petition dismissed.

I.       Summary of the Offense Conduct[1]

Quazi Mohammad Rezwanul Ahsan Nafis (hereinafter "Nafis") is a Bangladeshi citizen who entered the United States from Bangladesh on a student visa in January 2012. Prior to traveling to the United States, Nafis formed strong anti-American views. Nafis believed, among other things, that the United States was responsible for killing and raping Muslims all over the world. He also believed that the United States used its economic power to make puppets of governments in Muslim countries. While in Bangladesh, Nafis decided to take action based on his religious and political views. According to recorded statements, which Nafis repeatedly made during the course of the

---

[1] The facts contained herein are drawn from the Presentence Investigation Report, as well as the government's sentencing memorandum filed in this matter on August 1, 2013 (ECF #29).

investigation, he came to the United States for the specific purpose of conducting a terrorist attack. To this end, prior to coming to the United States, Nafis acquired operable bomb-making instructions and brought these instructions with him to the United States. He also brought lectures from Anwar al-Awlaki, the deceased leader of al-Qaeda in the Arabian Peninsula ("AQAP").

Within months of arriving in the United States, Nafis used and attempted to use the internet to recruit like-minded individuals to help him carry out a terrorist attack. One of the individuals Nafis contacted was a radical Islamist known to Nafis as "Yaqueen." Yaqueen proposed attacking a military base in Baltimore that he was familiar with, but Nafis insisted that the target of the attack would need to have a higher public profile to be effective. Nafis indicated that he wanted his attack to result in "mass destruction" without regard to whether the victims were military or civilian. Nafis also contacted another individual in the United States known to Nafis as "Fahim." Nafis repeatedly attempted to recruit Fahim to participate in a terrorist attack, but Fahim declined to join Nafis's plan. Nafis also reached out to individuals overseas to assist him in his plan. In recorded statements, Nafis reported that he had contacts overseas, including al-Qaeda members, who could assist him in carrying out a terrorist attack.

Fortunately, Nafis reached out to an FBI confidential human source (the "CHS") through the internet to recruit the CHS into his (Nafis's) jihadist cell. Nafis told the CHS that he admired Usama bin Laden, and that he traveled to the United States to wage jihad. Nafis also told the CHS that he was in contact with a "brother" in Bangladesh. Nafis discussed becoming a martyr with the CHS, and told the CHS that he (Nafis) had obtained an Islamic ruling from an individual in Bangladesh blessing his plan to conduct a terrorist attack inside the United States.

Based on, among other things, Nafis's aggressive attempts to recruit radical individuals into a jihadist cell, his statements concerning his intentions to conduct a terrorist attack, his connections overseas, and indications that he possessed bomb-making instructions (which later proved correct), the FBI and the U.S. Attorney's Office decided to conduct a sting operation.

Pursuant to the sting operation, the CHS offered Nafis an opportunity to meet with an al-Qaeda facilitator in the United States who could help carry out his plan, if he so wished. Nafis eagerly and emphatically expressed his desire to meet with this purported al-Qaeda facilitator. Nafis was told to contact the purported al-Qaeda facilitator only if he was ready to carry out a terrorist attack. Nafis indicated he was ready and took the step of contacting the purported al-Qaeda facilitator. In no uncertain terms, Nafis stated that he wanted assistance from al-Qaeda in launching a terrorist attack in the United States.

On July 19, 2012, an undercover law enforcement officer posing as an al-Qaeda member and facilitator (the "UC"), spoke with Nafis and arranged a meeting in Central Park several days later. On July 24, 2012, Nafis met the UC in Central Park. During

2

that meeting, Nafis told the UC, in sum and substance, that he wished to launch a terrorist attack against the United States.  Nafis further told the UC, in sum and substance, that he was collaborating with two other individuals – referring to Yaqueen and the CHS – and that those individuals also wanted to participate in the attack.  Nafis stated, "We are ready for action." Nafis then said, in sum and substance, that he, Yaqueen and the CHS "don't care anything about our work.  We just want to meet our lord as soon as we can."  Nafis continued:

> What I really mean, is that I don't want something that's like, small.  I just want something big.  Something very big.  Very very very very big, that will shake the whole country, that will make America, not one step ahead, change of policy, and make one step ahead, for the Muslims . . . that will make us one step closer to run the whole world . . . .

On August 5, 2012, Nafis told the UC, in sum and substance, that Nafis was considering the New York Stock Exchange as a possible target.  On August 9, 2012, FBI agents conducting surveillance of Nafis observed him in the area of the Stock Exchange, apparently as part of Nafis's efforts to assess its suitability as a target.  Surveillance agents also observed Nafis appearing to take notes while he was in the area of the Stock Exchange.

On August 11, 2012, Nafis met with the UC in a hotel room in Queens, New York.  During that meeting, Nafis confirmed that he wanted to target the financial district of Manhattan – specifically, the New York Stock Exchange.  Nafis told the UC, in sum and substance, that he wanted to use explosives as part of a suicide attack, either contained in one or more cars, or strapped to his person.  Nafis explained, "We are going to need a lot of TNT or dynamite."  Nafis also provided the UC with a handwritten map of the area that Nafis had apparently prepared while scouting the area around the Stock Exchange on August 9, 2012. Nafis asked the UC whether approval for Nafis's proposed attack would come from the "top" of the al-Qaeda leadership.  The UC responded, in sum and substance, that he was going to meet with al-Qaeda leadership and advise them about Nafis's plan.  Nafis and the UC then traveled to the financial district in Manhattan, and Nafis took several photographs of prospective targets in that area.

On August 23, 2012, Nafis again met with the UC in a hotel room in Queens, New York.  Just a few minutes after arriving at that meeting, Nafis asked, "The thing that I want to ask you about is that, the thing that I'm doing, is it under al-Qaeda?"  The UC responded in the affirmative.  The UC subsequently asked Nafis what Nafis needed to carry out his proposed attack, and Nafis explained that he needed a "big car with lots of fruits and vegetables in there which can blow up the whole New York Stock Exchange building." Nafis added that he needed "to make sure that this building is gone."  Nafis told the UC that he understood and was committed to al-Qaeda's ideology.  Nafis also asked the UC why the UC did not join him in carrying out the attack.  Nafis asked, "Can I ask you something? Why aren't you (inaudible) to drive the car yourself?  Why don't you want to be shahid[martyr]?"  The UC responded, in sum and substance, that it was his role to facilitate

Nafis's attack.  At the conclusion of that August 23, 2012 meeting, the UC advised Nafis that the UC was going to travel overseas to meet with al-Qaeda leadership to discuss Nafis's proposed attack.  The UC further told Nafis that the UC would contact Nafis again when the UC returned.

On August 26, 2012, FBI agents performing surveillance again observed Nafis in the area of the financial district, apparently again for the purpose of scouting the location for his proposed attack.

The next day, on August 27, 2012, Nafis told the CHS that he believed that he (Nafis) was now a member of al-Qaeda and that they were obtaining final approvals for the attack from al-Qaeda leadership.  Later during the same discussion, Nafis told the CHS, in sum and substance, that his upcoming attack was going to be a "one man job," indicating that Nafis did not want the CHS or Yaqueen to be directly involved in Nafis's attack on the financial district.  Nafis and the CHS then discussed how the CHS and Yaqueen might launch their own attacks after Nafis's attack was complete.

On September 15, 2012, following the UC's purported return to the United States, Nafis again met with the UC in a hotel room in Queens, New York.  During that meeting, Nafis told the UC, in sum and substance, that he wanted to launch an attack on the financial district involving explosive devices in multiple cars with other individuals participating in the attack.  Nafis also confirmed that he was ready to kill himself during the course of the attack, but indicated that he wanted to return to Bangladesh to see his family one last time to set his affairs in order.  In addition, Nafis told the UC that, for operational reasons, he was considering attacking the Federal Reserve Bank instead of, or in addition to, the New York Stock Exchange.  Nafis also told the UC, in sum and substance, that he understood that the attack he was planning would result in a large number of civilian casualties, including of women and children, but still wanted to proceed with the attack.

On September 20, 2012, Nafis once again told the UC that he wanted to return to Bangladesh prior to launching his suicide attack in the United States to set his affairs in order.  The UC responded, in sum and substance, that Nafis was free to return to Bangladesh at any time, but that if he did so, he could not participate in the attack due to security concerns.  Nafis reacted with frustration and anger to the UC's position.  During a subsequent telephone call on September 23, 2012, Nafis urged the UC, in sum and substance, to remind the al-Qaeda leadership both that Nafis had come up with the attack plan himself, and that he had specifically traveled to the United States for the purpose of conducting a terrorist attack.

On September 27, 2012, Nafis again met with the UC.  At the beginning of that meeting, the UC explained to Nafis, in sum and substance, that the al-Qaeda leaders with whom the UC had purportedly consulted at Nafis's request would not wait for Nafis to return from Bangladesh before carrying out the attack due to operational security concerns.  However, they had authorized Nafis to use a remote controlled explosive device, rather than

launching a suicide attack.  The UC explained that as a result, Nafis could participate in the attack, if he so wished, and later return to Bangladesh to set his affairs in order.  The UC then asked Nafis whether Nafis wanted to continue to move forward with the plot, and Nafis repeatedly confirmed that he was committed to carrying out an attack on the financial district.  Indeed, Nafis was excited by the new plan to detonate the explosive device remotely because, he indicated, it would allow him to conduct additional terrorist attacks on U.S. soil.

On October 4, 2012, Nafis and the UC met and traveled to a warehouse in the Eastern District of New York (the "Warehouse").  Prior to that meeting, Nafis had obtained numerous items for use in the explosive device at the UC's request, including batteries and other electrical components.  During the meeting, Nafis and the UC purchased additional components to construct the explosive device, including large garbage bins to contain the purported explosive material.  Nafis told the UC, in sum and substance, that they should return to the financial district during their next meeting to finalize exactly how they would carry out the attack and escape.  Nafis told the UC: "We need to make a very concrete plan." In addition, when the UC asked whether Nafis was ready to proceed with the attack, Nafis responded: "There is nothing stopping me."

On October 12, 2012, Nafis and the UC met and transported what Nafis believed to be explosive material to the Warehouse.  Upon arriving at the Warehouse, Nafis and the UC offloaded approximately twenty fifty-pound bags of this purported explosive material into a trailer.  Nafis also gave the UC a tarp that he had previously purchased to cover the purported explosive device when it was placed in the van.  Nafis also provided the UC with a thumb drive containing an article Nafis had written about his motivations for his attack.  Nafis believed that this article would be published by Inspire magazine.  In that article, Nafis included quotations from "[o]ur beloved Sheikh Osama bin Laden" to justify the fact that his plot likely involved the killing of women and children.  Nafis also stated the following:

> all I had in my mind are how to destroy America . . . I came up
> to this conclusion that targeting America's economy is most
> efficient way to draw the path of obliteration of America as well
> as the path of establishment of Khilapha[caliphate].
>
> I decided to attack the Federal Reserve bank of New York
> which is by far the largest (by assets), most active (by volume)
> and most influential of the 12 regional Federal Reserve Banks.
> New York Federal Reserve Bank implements monetary policy,
> supervises and regulates financial institutions and helps
> maintain the nation's payment systems.

Shortly after this October 12, 2012 meeting, Nafis called the UC and informed the UC that he had purchased a second mobile telephone that Nafis would use to place the cellular telephone call to trigger the detonator for the bomb.

On October 13, 2012, as previously suggested by Nafis, Nafis and the UC returned to the financial district so Nafis could scout the site for his upcoming attack. During the drive to the financial district, Nafis plugged the thumb drive into his computer and read aloud his article that he intended to be published in Inspire.

On October 15, 2012, the UC called Nafis and advised that they would be ready to proceed with the attack on October 17, 2012. Nafis agreed and indicated, in sum and substance, that he was eager to proceed with the attack on that day. The next evening, on October 16, 2012, Nafis called the UC and stated, in sum and substance, that he wanted to "add something" to the planned attack, and that he wanted the attack "to happen, no matter what."

In the early morning of October 17, 2012, Nafis and the UC met and drove to the Warehouse in a van (the "Vehicle"). During this drive to the Warehouse, Nafis told the UC, in sum and substance, that he had a "Plan B," which involved changing the attack into a suicide bombing operation in the event that Nafis believed the attack was about to be thwarted by police. After arriving at the Warehouse, Nafis assembled the purported one thousand pound explosive device, pouring the bags containing the inert explosive material into the trash bins and placing them inside the Vehicle. He also installed components for the purported detonator. As Nafis and the UC prepared to leave the Warehouse, Nafis collected the empty bags that had contained the inert explosive material and placed them in the van. Nafis then told the UC, in sum and substance, that he was collecting the extra bags because he believed that there might be residual explosive materials in the bags that would contribute to the strength of the anticipated detonation and kill more people.

The UC then drove the Vehicle from the Warehouse with Nafis in the passenger seat to the New York Federal Reserve Bank. During this drive, Nafis explained that his jihadist views were shaped, in part, by videotaped sermons of Anwar al-Awlaki. In addition, Nafis told the UC that he wanted to record a video statement prior to detonating the device. Before entering Manhattan, Nafis armed the purported explosive device for detonation by turning on the cellular phone to be used in the detonator, installing the battery in the detonator and connecting the wires linking the detonator to the purported explosive materials.

Upon arriving at the New York Federal Reserve Bank, Nafis and the UC parked the Vehicle, exited, and walked to a nearby hotel. Once inside a room at the hotel, Nafis told the UC to film a video statement Nafis wanted to make concerning the attack. During a video recorded statement to the American public, Nafis stated: "We will not stop until we attain victory or martyrdom."

While making his video statement, Nafis covered his face, wore sunglasses, and disguised his voice. After completing the video, Nafis repeatedly attempted to detonate the purported bomb by placing multiple telephone calls to the cellular telephone that he had installed as the initiating device for the detonator. By placing these calls, Nafis was

6

attempting to detonate the purported bomb inside the Vehicle, which was parked next to the New York Federal Reserve Bank.

II.    Procedural History

Nafis was arrested on October 17, 2012 shortly after attempting to trigger the purported bomb. On February 7, 2013, Nafis pleaded guilty before Your Honor to Count One of the Indictment, which charged him with attempting to use a weapon of mass destruction, in violation of Title 18, United States Code, Section 2332a(a). The terms of his plea agreement provided, in relevant part:

> The defendant agrees not to file an appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, the conviction or sentence in the event that the Court imposes a term of imprisonment of life or below.

(Nafis Plea Agreement ¶ 4 (attached as Exhibit A)). Further, during the change-of-plea hearing, the following exchange occurred between the Court and the defendant:

> THE COURT: All right. I want to bring one part of the agreement specifically to your attention because it involves giving up another right that you have. And it's in paragraph 4. "The defendant agrees not to file an appeal or otherwise challenge by petition pursuant to 28, U.S.C., Section 2255, or any other provision, the conviction or sentence in the event that the Court imposes a term of imprisonment of life or below."
>
> So effectively what that means is, as I understand it, is you will not be able to appeal any sentence the Court imposes on you. Do you understand that?
>
> THE DEFENDANT: I do.
>
> THE COURT: And that you will not be able to come back at a later time when you're in prison and challenge pursuant to a habeas corpus petition your conviction or sentence.
>
> Do you understand you're giving up those rights?
>
> THE DEFENDANT: Yeah, I understand.

(2/7/13 Plea Tr. at 11-12 (attached as Exhibit B)).

The Court sentenced Nafis on August 9, 2013. Prior to the Court imposing sentence, Nafis stated:

7

> THE DEFENDANT: I'm ashamed. I'm lost. I tried to do a terrible thing. I alone am responsible for all I have done. Please forgive me. I'm really ashamed that I believed the radicals now. I know it's wrong. It's wrong. I'm really grateful that the agents saved me. They treated me with real dignity.

(8/9/13 Sentencing Tr. at 39-40 (attached as Exhibit C)). In imposing a sentence of 30 years' imprisonment, the Court stated:

> The seriousness of the offense to which this defendant entered his guilty plea is perhaps exceeded only by the offense he would have committed had this plot been successful. The defendant's goal was to detonate a thousand pounds of explosives outside of the Federal Reserve Bank, destroying that building, killing its inhabitants as well as the unfortunate men, women and children who may have been in the vicinity. Thankfully, in pursuing his goal, he encountered sources and an undercover agent of the Federal Bureau of Investigation. Indeed, today even the defendant purports to be grateful for that fact.
>
> I am persuaded that the defendant was a serious threat to the safety of New Yorkers, Americans and that he would have executed this plan or a similar, perhaps less grand one, had he not been discovered by the men and women of both our federal law enforcement and local law enforcement communities who work so tirelessly to protect us from plots fostered by the very type of blind hatred that influenced this defendant.

(8/9/13 Sentencing Tr. at 41).

The Court entered its Judgment on August 15, 2013. Nafis filed a notice of appeal on that same date, but subsequently withdrew the notice. On January 14, 2014, the Court of Appeals issued its mandate so ordering the stipulation withdrawing Nafis's appeal.

III.    Nafi's Petition Is Barred by His Plea Agreement

As an initial matter, Nafis's petition is explicitly barred by his plea agreement. (Nafis Plea Agreement ¶ 4). He signed this agreement, and told the Court under oath during his change of plea hearing that he had reviewed the plea agreement with his attorney prior to signing it and that he understood the agreement. (2/7/13 Plea Tr. at 10). The Court also confirmed that Nafis understood that, pursuant to the agreement, he was waiving any right to appeal "or otherwise challenge by petition pursuant to 28, U.S.C., Section 2255, or any other provision, the conviction or sentence in the event that the Court imposes a term of life imprisonment or below." (Id. at 11-12).

8

The Second Circuit has long held that a knowing and voluntary waiver of the right to appeal or to bring a collateral challenge to a conviction or sentence, such as the one Nafis entered, is presumptively enforceable. See, e.g., United States v. Riggi, 649 F.3d 143, 147 (2d Cir. 2011) (internal citation omitted); United States v. Haynes, 412 F.3d 37, 38 (2d Cir. 2005); United States v. Morgan, 406 F.3d 135, 137 (2d Cir. 2005); United States v. Monzon, 359 F.3d 110, 116 (2d Cir. 2004); United States v. Hernandez, 242 F.3d 110, 113 (2d Cir. 2001); United States v. Garcia, 166 F.3d 519, 521 (2d Cir. 1999); United States v. Chen, 127 F.3d 286, 289 (2d Cir. 1997); United States v. Yemitan, 70 F.3d 746, 747 (2d Cir. 1995). The Second Circuit has articulated the importance of enforcing such waivers, reasoning in the context of an appellate waiver that permitting a defendant who has secured the benefits of a plea agreement to appeal a sentence conforming to the agreement would "render the plea bargaining process and the resulting agreement meaningless," United States v. Salcido-Contreras, 990 F.2d 51, 53 (2d Cir. 1993) (per curiam).

When determining whether a plea agreement was entered into knowingly and voluntarily, the principal area of inquiry should start with the plea proceeding itself. As the Supreme Court has observed, "the representations of the defendant, his lawyer, and the prosecutor at . . . a [plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings." A defendant's own statements made under oath at his plea hearing, therefore, carry "a strong presumption of verity." Blackledge v. Allison, 431 U.S. 63, 73-74 (1977); see also Yushuvayev v. United States, 532 F. Supp. 2d 455, 471 (E.D.N.Y. 2008) (Glasser, J.); Schwamborn v. United States, 507 F. Supp. 2d 229, 245 (E.D.N.Y. 2007) (Glasser, J.).

While a waiver of appellate and collateral attack rights does not prevent a defendant from challenging the constitutionality of the process by which he waived those rights, see Hernandez, 242 F.3d at 114, where a defendant has knowingly and voluntarily waived his right to bring a collateral challenge to his conviction or sentence, a 2255 petition raising such a challenge to his conviction or sentence must be dismissed. See Garcia-Santos v. United States, 273 F.3d 506, 508 (2d Cir. 2001). Exceptions to this presumption of enforceability of the waiver "occupy a very circumscribed area of [the Circuit Court's] jurisprudence." United States v. Gomez-Perez, 215 F.3d 315, 319 (2d Cir. 2000). As the Second Circuit has held, it will refuse to enforce a waiver of appellate or collateral attack rights:

> only in very limited situations, "such as when the waiver was not made knowingly, voluntarily, and competently, when the sentence was imposed based on constitutionally impermissible factors, such as ethnic, racial or other prohibited biases, when the government breached the plea agreement, or when the sentencing court failed to enunciate any rationale for the defendant's sentence."

United States v. Arevalo, 628 F.3d 93, 98 (2d Cir. 2010) (quoting Gomez-Perez, 215 F.3d at 319). Thus, "[a] violation of a fundamental right warrants voiding an appeal waiver," but

"other meaningful errors are insufficient[.]" <u>Riggi</u>, 649 F.3d at 147.  Further, the Second Circuit has upheld waivers "even in circumstances where the sentence was conceivably imposed in an illegal fashion or in violation of the Guidelines, but yet was still within the range contemplated in the plea agreement." <u>Gomez-Perez</u>, 215 F.3d at 319.

The transcript makes clear that Nafis's waiver of his rights to appeal and to otherwise collaterally challenge his conviction and sentence was knowing and voluntary. Accordingly, the Court should enforce Nafis's waiver of his collateral attack rights and reject his petition without reaching the merits of his claim.

IV.    <u>Nafis's Petition Is Untimely and Procedurally Barred</u>

Nafis's petition is untimely.  His conviction was final – under the most liberal analysis – on January 14, 2014, when the Court of Appeals so ordered the stipulation withdrawing his appeal, and pursuant to the statute he had one year from that date to file his petition.  <u>See</u> 28 U.S.C. § 2255(f)(1).  He failed to do so.  Nafis argues that his petition is timely because he filed within one year of learning the "legal facts" giving rise to his motion.  (Petition at 16).  However, all of the facts giving rise to this petition were known to Nafis by, at the latest, the date his conviction became final.  That Nafis purportedly learned the legal consequences of those facts later does not toll the statute of limitations under Section 2255(f)(4).  <u>See, e.g.</u>, <u>Lebron v. United States</u>, No. 06 CV 5049 (SWK), 2007 WL 1159646, at *2 (S.D.N.Y. Apr. 18, 2007) ("if Lebron truly did not understand the plea proceedings, as he claims, then he knew of his lack of understanding while those proceedings transpired.  In this respect, it is irrelevant for purposes of § 2255's one-year period of limitations that Lebron may not have grasped the legal significance of his lack of understanding") (citing <u>United States v. Pollard</u>, 161 F. Supp. 2d 1, 10 (D.D.C. 2001) ("[P]aragraph four of § 2255 is only triggered when a defendant discovers facts, not the legal consequences of those facts.")); <u>Izzo v. United States</u>, No. 00 CV 4087 (SJ), 2006 WL 1026718, at *4 (E.D.N.Y. Apr. 14, 2006) (same).

Nafis's claim is likewise procedurally barred on collateral review because he has never before raised it with this Court or on direct appeal, and he has made no showing of (1) good cause to excuse the default and ensuing prejudice, or (2) actual innocence.  <u>See Bousley v. United States</u>, 523 U.S. 614, 622 (1998); <u>United States v. Thorn</u>, 659 F.3d 227, 231 (2d Cir. 2011).  For these reasons, Nafis's petition should be dismissed.

V.    <u>Nafis's Petition Also Fails on the Merits</u>

To the extent the Court reaches the merits of Nafis's claim, it should deny that claim.  Nafis's novel argument appears to be, in essence, that the government violated his constitutional rights by <u>not</u> arresting him before he attempted to detonate a weapon of mass destruction on a weekday morning outside of the New York Federal Reserve Bank. Specifically, Nafis claims he was already guilty of "making terrorist threats" months before he was ultimately arrested, and that by not arresting him sooner, the government violated his "Fourth Amendment right to the reasonable seizure of my body to be placed into a mental institution. . . ." (Petition at 7).  He further argues that rather than arresting him for his lesser

10

offense, the FBI unfairly manipulated him into committing his much more serious crime of conviction.  (Id. at 7-8).

With respect to the timing of the defendant's arrest, the government's conduct in this matter was well within the appropriate scope of its prosecutorial discretion.  See, e.g., Wayte v. United States, 470 U.S. 598, 607 (1985).  From early in the investigation, it was apparent that Nafis had substantial ties to overseas bad actors, that he was highly motivated and was aggressively recruiting co-conspirators to join his terrorist plot, and that he was very dangerous.  The investigative strategy employed by the FBI allowed agents to develop overwhelming evidence against Nafis, identify his co-conspirators, and then to successfully arrest him with no loss of life (including his own), or harm to property.

The Court should likewise reject Nafis's request for resentencing without reliance upon Sentencing Guidelines Section 2A2.1, the attempted murder provision.  (Petition at 8).  While Nafis now claims that he never intended to murder anyone, and instead sought to target the U.S. economy, in fact, he picked the target and he sought to maximize the number of civilian casualties.  These facts confirm the appropriateness of the Court's sentencing Nafis based on the attempted murder guideline.

Finally, to the extent that Nafis now argues something akin to entrapment, his claim is wholly untethered from his criminal conduct and his statements to agents and the Court following his arrest.  The attack was Nafis's idea.  He chose the target.  He conducted reconnaissance.  He pulled the trigger.  And in his conversations with the UC, he was clear that he wished the attack to produce maximum civilian casualties.  That Nafis now wishes that his crimes had been less serious, and thus resulted in a lesser sentence, is unsurprising.  However, it is also of no moment.

VI.     Conclusion

        For the reasons set forth above, Nafis's claim should be denied, and his petition should be dismissed.

        Respectfully submitted,

        RICHARD P. DONOGHUE
        United States Attorney

By:         /s/
        Richard M. Tucker
        Assistant U.S. Attorney
        (718) 254-6204

Enclosures

cc:    Clerk of Court (CBA) (by ECF)
       Quazi Mohammad Rezwanul Ahsan Nafis (by US Mail)

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of this letter has been filed with the Court and served by U.S. mail upon the defendant, Quazi Mohammad Rezwanul Ahsan Nafis, Register No. 81710-053, FCI EDGEFIELD FEDERAL CORRECTIONAL INSTITUTION P.O. BOX 725 EDGEFIELD, SC 29824, on the 27th day of July, 2018.

<u>/s/ Richard M. Tucker</u>
Richard M. Tucker
Assistant U.S. Attorney
