# Exhibit C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------x
UNITED STATES OF AMERICA,
                Plaintiff,

                                          12-CR-720
                                            (CBA)

              versus                 United States Courthouse
                                     Brooklyn, N.Y.  11201
QUAZI MOHAMMAD REZWANUL AHSAN NAFIS,

              Defendant.
----------------------------------------x

                                     August 9, 2013
                                     9:30 A.M.


        TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
               Before HON. CAROL B. AMON,
               UNITED STATES DISTRICT JUDGE


              A P P E A R A N C E S:
ATTORNEYS FOR GOVERNMENT:

LORETTA LYNCH, ESQ.
United States Attorney - Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York  11201
BY:  JAMES P. LOONAM, ESQ.
     RICHARD M. TUCKER, ESQ.
Assistant United States Attorneys


ATTORNEY FOR DEFENDANT:

FEDERAL DEFENDERS OF NEW YORK
Attorney for the Defendant
One Pierrepont Plaza - 16th Floor
Brooklyn, New York 11201

BY: HEIDI C. CESARE, ESQ.


ALSO PRESENT:

BRIDGET BEHLING, ESQ.

                JUDI JOHNSON, RMR, RPR, CRR, CLR
                    Official Court Reporter

2

Proceedings

UNITED STATES PROBATION DEPARTMENT
Eastern District of New York
75 Clinton Street
Brooklyn, New York 11201
BY: MICHAEL DORRA, U.S.P.O.

Court Reporter:  Judi Johnson, RMR, RPR, CRR, CLR
Official Court Reporter
Telephone: (718) 613-2582
Facsimile: (718) 613-2480
E-mail: Judi_Johnson@nyed.uscourts.gov

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

* * * *

(In open court.)

(Defendant present in open court.)

COURTROOM DEPUTY:  All rise.  The United States

District Court for the Eastern District of New York is now is

session.  The Honorable CAROL B. AMON is now presiding.

(Honorable CAROL B. AMON takes the bench.)

COURTROOM DEPUTY:  Calling CRIMINAL CAUSE FOR

SENTENCING in Docket No. 12-CR-720, United States of America

Proceedings

against Quazi Mohammad Rezwanul Ahsan Nafis.

Counsel, please note your appearances for the record.

MR. LOONAM:  For the United States of America, Assistant United States Attorney James Loonam, Rich Tucker and Bridget Behling, a trial attorney with the counterterrorism unit.

Good morning, your Honor.

MS. CESARE:  Heidi Cesare for Mr. Nafis.

THE COURT:  Good morning.

Ms. Cesare, is there any legal reason why we should not proceed with the sentencing this morning?

MS. CESARE:  No, your Honor.

THE COURT:  Have you read the presentence report, the two addenda, and obviously read your own submissions?

MS. CESARE:  I've read one addendum.

THE COURT:  There is a second one.

MS. CESARE:  What is the date on the second one?

THE COURT:  August -- July 31st.

MS. CESARE:  Thank you.

(The second addendum is reviewed with the defendant.)

MS. CESARE:  Thank you.  We're ready to proceed.

THE COURT:  Have you had enough time to review that with Mr. Nafis?

Proceedings

MS. CESARE:  Yes.

THE COURT:  Mr. Nafis, have you read your presentence report?

THE DEFENDANT:  Yes, I have.

THE COURT:  And there was the first addendum.  Did you see that one?

THE DEFENDANT:  Yes, I did.

THE COURT:  Have you had adequate time to go over the second addendum with your counsel?

THE DEFENDANT:  Yes, I think so.

THE COURT:  Are you satisfied to have her represent you?

THE DEFENDANT:  Yes, I am.

THE COURT:  The first matter I believe we need to take up is there were some challenges to the presentence report, factual challenges, as well as the guideline challenges.  With respect to the challenges, I believe that both you and the government are of the view that the guidelines are 360 to life; is that correct?

MR. LOONAM:  That's correct, your Honor.

MS. CESARE:  Yes.

THE COURT:  Maybe the government can tell me, looking at Page 11 of the report, precisely how you get to that calculation.  I know you both get to the same calculation.  I'm not sure you necessarily do it the same way.

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

Proceedings

MR. TUCKER:  I believe that we do, your Honor.

THE COURT:  All right.  So just tell me.  You start with 33 at Paragraph 52?

MR. TUCKER:  That's correct, your Honor.  It's a base offense level of 33.

THE COURT:  Now, as with respect to the victim-related adjustment, which probation believes is appropriate, that the target of the attack was based on national origin, I have a letter from the government indicating that you cannot prove that by proof beyond a reasonable doubt.

MR. TUCKER:  By a preponderance, your Honor.

THE COURT:  I thought you said --

MR. TUCKER:  I'm sorry, my apologies.  Beyond a reasonable doubt, that's correct.

THE COURT:  Which, I take it, is the requirement for that enhancement?

MR. TUCKER:  Yes.

THE COURT:  So the government having said that, then the enhancement would have to be removed.  So that's 33.

And then at Paragraph 55, it would be 12?

MR. TUCKER:  Correct, your Honor.

THE COURT:  Now, the adjusted offense level, what is the adjusted offense level?

MR. TUCKER:  Your Honor, 33 plus the 12 takes the

6

Proceedings

government to 45.  That obviously doesn't take into account the acceptance of responsibility yet, your Honor.

THE COURT:  All right.  This is where I was confused with your calculations.  You agree it's 360 to life though?

MS. CESARE:  Yes.

THE COURT:  But if it's 45 and you subtract three, you get to 360 to life.  I don't think you agree with the 45; am I correct?

MS. CESARE:  That is correct.

THE COURT:  All right.  You believe that there is a provision that reduces that to 43?

MS. CESARE:  Yes.

THE COURT:  What provision is that?

MS. CESARE:  One minute, please.

I relied on the commentary in guideline 3(D)(1.3), application note one.  This is the guideline that tells us how to conduct grouping analysis.  But that application note has a definition of offense level.  And that definition tells us that the offense level is -- refers to the offense level after application of Chapter 2 and all of the adjustments from parts A, B and C from Chapter 3.  The offense level, by definition, does not include the acceptance of responsibility reductions.

And I then looked at the commentary to the sentencing table, which has application note commentary.  And application note two to the sentencing table tells us that any

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

Proceedings

offense level of more than 33 is treated -- is to be treated as an offense level of 43.

So my interpretation of these two sets of commentaries is that for purposes of guideline calculation, the maximum guideline is 43 before we adjust for acceptance of responsibility.  So I -- my -- our position is that the adjusted offense level, taking into account that commentary, should be 43.  With three points off for acceptance of responsibility, the total adjusted offense level then becomes 40.  The sentence range at 40 for criminal history category six is 360 to life.  So we get to the same place.  We have a different guideline analysis.

THE COURT:  Mr. Loonam?

MR. LOONAM:  Your Honor, I mean, if I understand defense counsel's argument, it would seem that the upper levels of the table would almost always be capped under that commentary.  So the government has applied the guidelines as written and believes that the appropriate guideline is as set forth in the government's papers.  It does get us to 360 to life.

I would note that with respect to the victim enhancement, it's that -- not that the target wasn't driven by national origin.  It's that it wasn't driven by the national origin of a person, which is the second part of that enhancement.  And the defendant, frankly, the government's

Proceedings

position is he didn't care who he killed in the bombing attempt.  There could have been persons surrounding the federal reserve from all nationalities, from all backgrounds. It was the U.S. economy that the defendant was looking to target to change U.S. foreign policy.  But with respect to targeting a person, his killing would have been indiscriminate.  And based on that, that's the reason that the government's unable to prove beyond a reasonable doubt that he chose to target the Federal Reserve, to target a person based on their national origin.

THE COURT:  All right.  Well, I think both sides will agree it is an academic discussion with respect to whether Ms. Cesare's interpretation is correct or not because we come to the same place, which is a guideline of 360 to life.

Ms. Cesare, do you want to pursue any of the objections that you made to the factual content of the report?

MS. CESARE:  Yes.  Particularly in Paragraphs 4 and 5, where the probation department has included language advising the court -- informing the court about the organization called Al-Qaeda.  We understand that the government -- we understand why the government believes that information should be included in the presentence report. We'll leave that to the court's discretion.  But we think it is also very important that the offense conduct fairly states

Proceedings

Mr. Nafis is not a member of Al-Qaeda and never was a member of Al-Qaeda. I don't believe that fact -- those facts are at all in dispute, and I think that simple language clarifying --

THE COURT: Well, isn't that set forth in Paragraph 46?

MS. CESARE: It is set forth in Paragraph 46. I think it should be set forth up front to give an evenhanded -- make an evenhanded, fair statement of the relationship of this case to the organization known as Al-Qaeda. It's important to us because Mr. Nafis is certainly looking at a very long sentence. And we believe that this language may have some effect on his conditions of confinement going forward as he serves his sentence.

THE COURT: Does the government want to be heard on this?

MR. TUCKER: Your Honor, I think that the PSR, as your Honor noted, does capture that fact. The point of this section of the PSR is to provide background. It's not fact specific or case specific. And I think that the concept is captured adequately in Paragraph 46.

THE COURT: Yeah. I'm not -- I don't think that it's necessary to direct any changes to the PSR in this regard. The information in the PSR is accurate, and it does state at Paragraph 46 that the case agent advised that the defendant is not a member of Al-Qaeda.

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

10

Proceedings

The background information is important because it is my understanding that it was that organization that he was seeking to impress and seeking to become a member of or wanted to engage in these activities pursuant to their creed of destroying Americans and financial institutions in the United States.  So I think it's clearly appropriate to identify what organization it is in the report.  So I don't think there is a need to change the report.

I think the other issues that you've objected to we've essentially dealt with.

Is there anything else that you want to highlight to the court, Ms. Cesare?

MS. CESARE:  Yes.

THE COURT:  I mean, the enhancement, I'm not applying the enhancement.

MS. CESARE:  Right.  So those objections are resolved.

We have objected to portions of Paragraphs 6, 12, 13 and 78.  In Paragraph 6, we've complained that it doesn't -- we're opposed to the phrase the jihadist cell and the way it's used in that paragraph.  We think a more accurate and less sensational phrase would be conspiracy.  "Jihadist cell" is a phrase, it's a popular phrase, and it has no specific legal meaning.  And it seems to me that most people would believe that a jihadist cell, the word "cell" suggests a small part of

11

Proceedings

a larger organization.  And by saying he was part of a cell, a jihadist cell in particular, the inference is that Mr. Nafis was, in fact, part of Al-Qaeda.  And I think that is misleading, and I think describing his relationship to others as a conspiracy is exactly correct and sensible.

THE COURT:  What's the government's position on that?

MR. TUCKER:  Your Honor, I think the salient point that's captured in this paragraph and through the use of that phrase is that the defendant was in the process of attempting to recruit others to work with him to launch a terrorist attack in the United States.  At least one of those individuals have been referenced in the government's complaint and other documents are keen.  The fact of the matter was that the defendant ultimately reached out to a government source.  But that was not the only person he was attempting to recruit, and he had developed this concept of an attack long before reaching any government actor.

In terms of defense counsel's reference to Al-Qaeda and a cell being part of Al-Qaeda and a cell being part of Al-Qaeda, I don't see that inferential connection.  I think the point here is that there's a cohesive unit that the defendant was at the center of, and his objective was to gather others and recruit others.

MR. LOONAM:  Your honor, If I could just -- one

Proceedings

point to add to that, and I would ask to confer with defense

counsel briefly with respect to the defense counsel's argument

about, you know, whether or not the defendant was part of

something greater than what he was attempting to do here in

the United States.  May I have permission to confer?

THE COURT:  Yes.

(Whereupon, a discussion was held off the record.)

MR. LOONAM:  Your Honor, I think the government's

happy to make clear that the jihadist cell the defendant was

seeking to establish was not part of Al-Qaeda.  I think that

satisfies defense counsel's concerns.

THE COURT:  So you would add to that -- are you

talking about agreeing to a change in the report to that they

attempted to recruit the source into a jihadist cell that was

not part of Al-Qaeda?

MR. LOONAM:  Attempting to recruit a source into a

jihadist cell.  This cell was not part of Al-Qaeda.  I think

that addresses defense counsel's concern, but I'll let defense

counsel speak.

MS. CESARE:  I think that --

THE COURT:  That was not, in fact, a part of

Al-Qaeda?

MR. LOONAM:  Correct.

MS. CESARE:  That's fine.

THE COURT:  Okay.  So we can just add that

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

13

Proceedings

additional language.

Anything else, Ms. Cesare, with respect to the contents of the report?

MS. CESARE:  I have requested two modifications, minor modifications to paragraphs 12 and 13.  The modifications I've proposed are intended to more accurately and evenhandedly describe the defendant's conduct.  At Paragraph 2, I've asked that the language be modified to indicate that he made false -- you know, statements he made to the undercover were, you know, falsely claimed.  He falsely claimed -- he made false claims to the undercover that what he was saying to the co-conspirator were not, in fact, true.

For instance, in the original presentence, report it's accurately reported that Mr. Nafis told the co-conspirator that he had contacts with Al-Qaeda members overseas.  He did make that statement.  But the truth of the matter is, it was a false claim on his part.  He was exaggerating and trying to impress the co-conspirator.

MR. LOONAM:  Your Honor, I think that the PSR is accurate as stated.  With respect to the context to that, again, I don't know if I need to confer with counsel for the rest of the context on that.

MS. CESARE:  Likewise, I agree that Paragraph 13 is correct.  13 is accurate.

THE COURT:  I don't think that we -- that much is

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

Proceedings

served by challenging statements that are accurate in the

report with other statements that the defendant may have made

at a different time.  I think the report reflects those

statements at other portions.  So I think it's clear enough.

I don't see that we need to change statements in reports that

are, in fact, accurate.  So I'm not inclined to change that or

direct that it be changed.

MS. CESARE:  The only remaining issue that's in my

letter to the court relates to the matter of Fernandez,

Fernandez information motion, to consider Fernandez type

information.  And I'm satisfied that the court is fully

informed on that topic, and I have no objection to

Paragraph 109 at this point.

THE COURT:  All right.  Because it's your view that

the court can consider that information under the case law --

MS. CESARE:  Correct.

THE COURT:  -- to impose a sentence outside the

advisory guidelines system.  And the government, although it's

their position that a guideline sentence should be imposed,

does not challenge that case law or the authority of the court

to do that.  Is that an accurate statement of the parties?

MR. LOONAM:  The government believes that your

Honor, under the Fernandez case, can account for the

defendant's statements in assessing his history and

characteristics under the 3553(a) factors as one of the

15

Proceedings

factors that goes into your Honor's consideration of an

appropriate sentence.

THE COURT:  And I think the only point that

Ms. Cesare is making is that I can consider that under 3553(a)

And if I so chose, that could be used as a grounds for

imposing a sentence outside the guideline range as a matter of

law.

MR. LOONAM:  Your Honor, I think as a matter of law,

your Honor can impose a sentence -- your Honor has wide

discretion in how you would sentence the defendant based on

the current state of the law.

THE COURT:  Is there anything else that you need to

address with respect to the report?

MS. CESARE:  No.  Thank you.

THE COURT:  Now, I've had numerous submissions,

principally from the defendant.  I have a submission of

July 25th, and there were responses to that submission from

the government by -- principle submissions.  There were two,

on August 1st.  I have a statement of Mr. Nafis that was

presented to the court, a response to that by the government

and then a response by the defendant clarifying the import of

what he believed those statements to be.  And then I have had

several recent letters.  You provided me, Ms. Cesare, with an

unredacted legible copy of a letter from the defendant's

mother.  And then the government has provided additional

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

16

Proceedings

information to the court in a video that you wanted to play and also a copy of certain materials that the defendant had with him when he entered the country. I think that's the constellation of materials that I should have.

Does either side believe that there's something that I should have that I don't have that you submitted?

MR. LOONAM: I think that's everything, your Honor.

THE COURT: Ms. Cesare?

MS. CESARE: I believe that's everything.

THE COURT: Okay. Then do you want to be heard? First the way I will proceed is to hear from the defendant, hear from the government -- when I say hear from the defendant, hear from counsel, hear from the government and then hear from Mr. Nafis. If there's anything that Mr. Nafis says that the government believes that they should respond to, they can respond to that. That's the procedure we'll follow.

Ms. Cesare.

MS. CESARE: Thank you very much.

Your Honor, let me begin by advising the court that nothing I say this morning should be inferred as an attempt to place blame on the government, the undercover or to be any complaint whatsoever or attacks of the government. We are not complaining about how the government prosecuted this case.

Likewise, in my remarks, I hope very much that no one draws the inference that we are blaming Mr. Nafis' family

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

17

Proceedings

or his parents for what he's done.  Mr. Nafis' parents love him dearly.  He's grateful for their affection.  Mr. Nafis takes full responsibility for what he's done.  Everything he's done and said in this case has been an intent to demonstrate that he understands that he alone is responsible for his behavior.  I intend to speak about his childhood.  I expect some of my remarks may be regarded as criticisms.  I apologize to his family, but I think it's important to talk to the court about Mr. Nafis' life and how he ended up trying to do such a terrible thing.

We understand that your Honor has the obligation of imposing a fair sentence in a very, very grave case.  We understand that the purpose of the sentence is a fair and just punishment.  It has to take into account exactly what Mr. Nafis tried to do.  It has to be sufficient to deter him, to assure the court that he is deterred from ever trying to do anything like this again.  And it has to be sufficient to deter other would be bad actors anywhere else in the world.

We understand your Honor must consider the advisory sentence guidelines; but we urge the court to remember that the guidelines are not mandatory, and they are not presumptively correct either.  We ask -- I intend to talk about Mr. Nafis' background and characteristics, what we know about him now after the pendency of this case.  We can talk a little bit about how other courts across the country have

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

18

Proceedings

handled very, very similar cases.

Mr. Nafis is from Bangladesh.  He's a young person. He's barely out of adolescence.  He was 21 years old when he committed this offense.  He comes from a middle class, professional class family in Bangladesh.  His family is educated.  His father is a retired banker.  His mother has a college degree and graduate degree.  She devoted her life to homemaking.  He has one older sibling, a sister who is a doctor.  His family believes in education for boys and girls. They're a modern, forward-looking family, not remotely radical in their beliefs.

While surely Mr. Nafis' family loved him very much, Nafis' childhood was exceedingly difficult for him, his childhood and adolescence, which we believe led to circumstances that made him very vulnerable to the attentions of radicalized students at his university in Bangladesh.

Mr. Nafis, as a boy, had a terrible stutter.  It was humiliating for him, frustrating.  He was unable to communicate.  People made fun of him.  It persisted for many, many years.  It has never been completely corrected.  His family, in their zeal to shelter him and protect him and in recognition of their home environment in Dahka, Bangladesh, which I understand is a very different place than New York City, didn't let him mingle or play with other children in the street.  His mother made sure he stayed at home in their

19

Proceedings

building.  He could play on the rooftop of his building, but he was not free to interact with other children.

His mother was intensely focused on the need to study and was a very strict parent and used very harsh corporal punishment methods with Nafis, who, unlike his sister, was not always an obedient child.  She beat him regularly, she whipped him, she threatened to whip him.  His parents recalled to us that when he was six years old, his mother beat him so terribly one time that he went mute.  He stopped talking.  It persisted for so long, the family decided to see a doctor about it.  The doctor's advice was stop beating your child so much.  His parents have admitted that his mother really did not moderate her behavior.  This pattern continued.

Nafis recalled to us one particular occasion where his father lost his temper in a situation, a computer game, while Nafis was playing a computer game and not listening to his father.  His father went into such a rage that he took the computer game, broke it and beat his son and so terrified him that Mr. Nafis urinated in his clothing.  And Nafis remembers that from that point always he considered his father a very frightening person and always avoided him.

So we have a young man who's raised in a very sheltered close environment with no freedom and very difficult -- under very difficult parenting circumstances.  I

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

Proceedings

have written to the court.  I've advised the court and discussed other very damaging, humiliating events that Mr. Nafis suffered as a child.

Mr. Nafis' mother, who certainly loves him, always has loved him, was so concerned about his studies that she did everything she could to make sure he was completely sheltered from hazards of the outside world and all -- it seems, unfortunately, all she accomplished was she made him particularly vulnerable.  She brought him to school every day and waited at school until classes were finished so she could bring him home from school every day until he went to university.  He had no -- he never had the experience of any independent decision making or freedom until he was at university.

When he arrived at university, he had a damaged and frail psyche.  He was depressed.  He had a breakup with a girl that resulted in suicidal ideation.  He was suffering completely unresolved post-traumatic stress disorder.  Felt lonely.  Felt like he didn't fit in.  And at university, he met other students who were highly radicalized and friended him and cultivated that friendship and relationship and schooled him in radical Islam, and Nafis adopted their views. He became radicalized.

And when he came to the United States in January 2012, his family thought he was coming here to study.

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

Proceedings

But at that time, as he traveled here, he did, he admits, have his own radical ideology and aspirations of doing some jihadist act at some place and some time in the future.

Mr. Nafis is a young man. He's barely out of adolescence now. His period of radicalization was brief. It was intense, but it is concluded. During the pendency of the case, everything he'd done, every decision he's made, every statement he's made has been intended to show his remorse and try to redeem himself. He confessed to what he did. He met with the prosecutors many times at length. He did his very best, shared all information he had that might be useful with them. He pled guilty promptly. He filed no frivolous motions of any kind. He engaged in no stalling tactics. He has behaved at the MDC. He has no disciplinary issues whatsoever. He has -- he's written to the court in what I believe is an awkward and imperfect but ultimately compelling statement.

He does not blame anybody else for his behavior. He's deeply ashamed of his behavior. He is in a state of grief for his own behavior, at what he's tried to do and how he's ruined his life. He's shown remorse. He's taken steps for redemption; and I believe that he will, as he serves his sentence, in whatever small steps he can take while he's incarcerated, eventually redeem himself.

We ask the court to also give heed to the requirements of, under the law, to avoid unwarranted

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

Proceedings

sentencing to severities.  We have taken a broad look and looked at all cases that a person might consider as substantially similar to this case, and we've looked at the cases the government has relied on.  In our letter to the court, we talk about four defendants, Mr. Smadi, Mr. Finton and Mr. Martinez and a Mr. Hassoun.  Those four defendants were, we believe, substantially similarly situated as is Mr. Nafis.  The criteria we used or we proposed to identify substantially similar cases are defendants who have been convicted of attempted possession of a weapon of mass destruction, who have indeed pled guilty, who have shown or expressed remorse for their behavior, who intended to carry out an Al-Qaeda inspired terrorist attack that would result in severe damage or loss of life, who were targets of an FBI sting operation, who attempted to detonate a bomb that was inert and FBI supplied, and who were not cooperators.

The case of U.S. versus Smadi fits squarely within those parameters.  He was 20 years old.  He was convicted in the Northern District of Texas.  He came to the FBI's attention from internet activity.  He developed a plan to blow up a building in downtown Dallas with a bomb.  During the sting, he attempted to use -- to detonate the bomb that was an inoperable truck bomb provided by the FBI.  At his sentencing, in that case, the court found the same -- did a guideline calculation that resulted in a 43 and a criminal history

23

Proceedings

category of six and an advisory sentence of 30 years to life. In that case, that young man was sentenced to 24 years in prison. We believe that Mr. Nafis' case is substantially similar to the Smadi case.

In the case of Mr. Finton, Mr. Finton was older, 10 years older than Mr. Nafis. He was a parole violator. He had a bit of a criminal record. But he also was involved in an Al-Qaeda inspired attempt to conduct a bombing in an FBI sting. He pled guilty to one count, and he was not a cooperator with the government. His guideline was also determined to be offense level 43, and he was sentenced to 28 years in jail, another variance.

In U.S. versus Martinez, Mr. Martinez was about the same age as Mr. Nafis. He was 22 years old. He was inspired by jihadist radical ideology. He worked with an FBI informant. He tried to blow up an SUV bomb, a vehicle or a bomb that was inert and provided during an FBI sting operation. In his case, the court determined that his guideline was a 40. It's not clear from the record, but I believe the sentencing court in that case may have used the guideline calculation I proposed in this case. Nonetheless, his advisory sentence range was 30 to life, and that young man was sentenced to 25 years in jail.

Mr. Hassoun was 25 years old, likewise a similar case. He tried to blow up a bomb near Wrigley Field in

Proceedings

Chicago. And he -- his guidelines -- the court in that case determined his guidelines -- his offense level to be a 46. I don't believe I know exactly how that calculation was done. But nonetheless, he had an advisory sentence range of life, and he was sentenced to 23 years in jail.

The government has brought up a couple of cases in their submissions. I'd like to address those cases. First of all, one of the cases the government talks about is the case of the defendant Mr. Defreitas, who went to trial with two co-defendants before Judge Irizarry in this courthouse. That case, I believe is clearly distinguishable. That is a case that went to trial. The defendant did not plead guilty in that case. And I don't believe that was actually an FBI sting operation. That was a case that involved a plot that they developed on their own. Those defendants were sentenced to life, but we don't believe that case is similar for purposes of analysis under 3553(a)(6).

The other two cases are fairly to be considered by the court but we believe are easily distinguishable from Nafis and show the court why a variance is reasonable in this case.

The government has referred to the case of United States versus Derrick Shareef. Shareef was -- pled guilty in the Northern District of Illinois. He was -- that was an FBI investigation. The agent in that case sold him grenades, which Mr. Shareef planned to use to blow up a mall in

25

Proceedings

Illinois.

In Mr. Shareef's case, Mr. Shareef made a lengthy post-arrest statement. He told the court that in his post 9-11 experience, he thought he was -- saw more radicalism on the television than other places. He told the judge he owned an assault rifle. He blamed an undercover agent in that case for not showing him the path to better behavior. And he told the court that he did not have remorse or regret for his actions. I think Mr. Shareef is not at all similarly situated to the defendant. He is a very, very different type of person than Mr. Nafis. In that case, the court considered the defendant's statements and advised that in light of his statements, he imposed a sentence of 35 years in jail.

We think it's reasonable to also consider the other case the government has brought to your attention, which is the case of U.S. Mr. El-Khalifi. He was convicted in the Eastern District of Virginia. Mr. Khalifi, after posting radical messages on Facebook, ended up being in contact with an FBI agent posing as an Al-Qaeda operative. Mr. Khalifi met with that agent many times and ultimately attempted to blow up the Capitol Building by arming himself with a fake bomb vest and carrying a Mac 10 firearm.

Mr. Khalifi, likewise, his case is different from the defendant's, and he is indeed a very different person. During the investigation of that case, it was evident that

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

26

Proceedings

Mr. Khalifi had real blood lust. He told the agents in that case that he really wanted to kill people face-to-face. He modeled that behavior with an inoperable gun that the agents gave to him. He had no remorse, never voiced any remorse whatsoever for his behavior. And he actually had a violent history and indeed had a conviction for assault preceding his involvement with the agents. When it was his time, the one and only statement he made to the court at his sentencing hearing was: I just to want to say that I love Allah. That's it.

Notably, in that case, the government in that case reached a plea agreement with the defendant, which had an 11(c)(1)(C) plea provision that set the parameters for a sentence of 25 to 30 years. The court imposed a sentence of 30 years in that case.

We believe Mr. Khalifi is a very different person than Mr. Nafis, and his case is easily distinguishable from the facts we have and know about this case.

Your Honor, if I may, with respect, I intend to propose a sentence. Our proposal is a sentence which we believe is a very, very severe sentence and fully accomplishes the purposes of sentencing. We propose that the sentence you impose should be two decades in jail, a sentence of 20 years. If the court were to impose that sentence, Mr. Nafis' sentence would terminate in the year 2032.

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

27

Proceedings

Mr. Nafis, that 20 years will surely be a very serious and difficult penalty for Mr. Nafis. We think it would be an appropriate penalty. He's in this country. His family is not here. His family, we suspect, will never be able to come here and visit him as they are Bangladeshi citizens. We don't know if they have the means or even the ability to get a visa to travel here to visit him. He's looking at a long separation from his family. He hopes very much that he will some day have a chance to be reunited with his mother and father. It seems that a sentence of 20 years gives some hope of that.

We believe that in 20 years time, he will fully redeem himself and age out completely of any inclination to do any criminal activity whatsoever. Mr. Nafis has abandoned completely his former radical beliefs. He wholeheartedly understands that radical Islamic jihad, that there's nothing good about it.

So for those reasons, we ask your Honor's forbearance. We believe that 30 years is more than necessary, especially in light of Mr. Nafis' really sincere good-faith attempts to cooperate with the government, his youth, circumstances of his life and the sentences imposed in other very, very similar cases. We pray that your Honor will grant a variance.

Thank you.

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

28

Proceedings

THE COURT:  All right.  Does the government want to be heard?

MR. LOONAM:  Yes, your Honor.

As an initial matter, as set forth in the plea agreement, the government takes no position with respect to where within the guidelines your Honor should sentence the defendant.  However, the defense has moved for a below-guideline sentence, and it's in response to that argument and to inform your Honor's consideration of the 3553(a) factors that the government raises the following points.

With respect to the nature and circumstances of the offense and the history and characteristics of this defendant --

THE COURT:  Well, just so I understand it quite clearly, you're opposing any variance from the guideline?

MR. LOONAM:  Yes, your Honor.  The government objects to any variance under the guideline.

THE COURT:  All right.

MR. LOONAM:  The government's not going to go through all of the offense conduct.  It's been well documented, and I believe there's no dispute here about the offense conduct.  But I do want to highlight a couple of very important points for your Honor's consideration.

Most importantly, the defendant posed a real and

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

Proceedings

imminent threat to the national security of the United States.

The evidence shows that the defendant came to the United

States from Bangladesh with the intention of conducting a

terrorist attack.  At the time of the defendant's arrest, the

agents seized a hard drive that contained operable bomb-making

instructions, together with lectures of Anwar al-Awlaki, the

now deceased leader of the Al-Qaeda offshoot AQAP or Al-Qaeda

in the Arabian Peninsula.

The metadata from that hard drive shows that these

bomb instructions were transferred to the hard drive on

January 8th, 2012.  The defendant arrived in the United States

a day later, on January 9th, 2012.  And thus, when the

defendant was packing to come to the United States, he made

sure to include his bomb instructions.

Now, we have submitted a copy of these instructions

under seal for your Honor's review, but there are just a

couple of things I'd like to note on the record about them.

These bomb-making instructions were distributed by Al-Qaeda in

the Arabian Peninsula, AQAP.  And there are four qualities of

the bomb that are detailed on the first page of those

instructions, and I'm going to quote from the instructions.

First, the ingredients are readily available.  Second, buying

these ingredients does not raise suspicion.  Third, it is

easily disposed of if enemy searches your home.  Sniffing dogs

are not trained to recognize them as bomb-making ingredients.

Proceedings

And fourth, in one or two days, the bomb could be ready to kill at least 10 people.  In a month, you can make a much bigger, more lethal bomb that could kill tens of people.

These instructions discuss using nails or metal balls for shrapnel, how pressure cookers are effective containers for these bombs and how the bombs should be placed in crowded areas.  And these are the instructions that the defendant chose to bring with him to the United States.  And based on public reports, this type of device sounds eerily similar to that that was used in the recent Boston attacks.

And the government respectfully submits that based on the evidence, in 2012 there were two things that stood between the City of New York and a Boston marathon type terrorist attack, and that's the efforts of the FBI and the NYPD and the Joint Terrorism Task Force and the defendant's own ambition for a larger-scale attack.

The defendant traveled to the United States on a U.S. visa to go to school in Missouri.  As reflected in the letters submitted by the defendant's family, they sacrificed greatly to send him here and give him that opportunity.  But within months of his arrival, the defendant left his school in Missouri and moved to New York.

He began recruiting like-minded radicals to help him carry out a terrorist attack, and the defendant made progress on that front, your Honor.  He found at least one other

Proceedings

like-minded radical, and they actively tried to recruit another.  And together they discussed potential targets, including a military base and a high-ranking U.S. official. And this was not idle chatter.  The defendant was proposing meeting times and places for the group to get together to move their plan forward.

The defendant was trying to assemble a jihadist cell, and the defendant was actively seeking out someone to assist him in carrying out a large-scale terrorist attack. Tellingly, he reached out to his connections overseas in furtherance of this goal.  Luckily, the defendant reached out to someone who was a source for the FBI.

And I'd just like to very briefly say a word about this source, because this person gets no credit for their service, your Honor.  This is a person, a Muslim American, who was not working off time, who was not expecting to be paid. This person was just providing the FBI with information on a potential threat.  This person should be commended.

The defendant made clear to the source that he was looking for an Al-Qaeda facilitator to help him carry out his plot.  The defendant left no doubt with respect to his jihadist intentions.  He was enthusiastic, and he was determined.  And during his communications, he previously made reference that indicated that he possessed bomb-making instructions.  It was at that point that Nafis, through this

Proceedings

source, was introduced to an FBI undercover.

And just a brief word about that, because there's been some questions raised in certain cases about FBI sting operations or undercover operations, including some of the cases that defense counsel made reference to. But this case exemplifies why this tool is absolutely essential to protect the public from future terrorist attacks. I believe, as the defense concedes, the use of an undercover operation and sting operation in this case was entirely appropriate and necessary and was carried out with the utmost professionalism.

The defendant himself has stated that he was not pressured in any way by the undercover to move forward with the attack. The attempt to bomb the Federal Reserve was the defendant's plan, the defendant's target and the defendant's actions.

On July 24th, the defendant met the undercover in Central Park for the first time. The defendant told the undercover that he had come to the United States to conduct jihad, and he wanted something very big, something the whole country -- that would shake the whole country and make America change its policy. He wanted to do something that would make Muslims one step closer to running the world. And this ties into the defendant's ambition. He told the undercover, he didn't want to do something that would just kill 20 or 30 people. He wanted to do something big because he wanted

33

Proceedings

revenge against America for America's foreign policy, and killing 30 people wasn't enough for him.  That's why the bomb-making notes weren't sufficient for his ambition.

So on August 9th, 2012, the defendant went down to the New York Stock Exchange in Manhattan to assess it as a target, a potential target that he chose wholly on his own.

And at this time, I request the court's permission to play a very short video which we've submitted.  It's Government Exhibit 2 for the sentencing record.  With your Honor's permission, may I play it?

THE COURT:  Yes.

(Video playing.)

THE COURT:  Is that the defendant who walks into the picture?

MR. LOONAM:  It is, your Honor.  We're going to bring up a still that we will introduce as Government's Exhibit 3.

So this video was taken August 9th, 2012, a year ago today, on what looks like maybe a nicer day during the summer, in front of the New York Stock Exchange, in that vicinity. And you have the defendant there in the hat, who enters the frame, and you see in his right hand --

If we can bring up the still, which we'll enter as Government Exhibit's 3, which we showed to the defense.  It's just a still of the same image, your Honor.

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

Proceedings

If your Honor looks at the lower left, the defendant is carrying something in his hand. That's a notebook and pen. He's conducting surveillance to assess the New York Stock Exchange as a target. And while he sees the tourists, the kids there on the right, people enjoying their day, visiting the city of New York on August 9th, he's looking at where he wants to conduct his attack.

Two days later, the defendant met with the undercover agent and emphatically confirmed that he wanted to bomb the New York Stock Exchange. After he saw that, what the defendant wanted to do was bomb the stock exchange. He asked the undercover to get a car bomb, and he said he would need lots of explosives. And he provided the undercover with a handwritten map that he drew of the New York Stock Exchange area so he could plan his terrorist attack. He told the undercover that he wanted an explosion big enough to bring the whole New York Stock Exchange building down. And the defendant later changed the target on his own, after conducting additional surveillance, to the Federal Reserve because he thought it would be an easier target for him to hit. It was a change for operational reasons.

And there are two more brief things I'd like to note about the offense conduct, your Honor. And I'm going to jump ahead here because your Honor knows from all the submissions, the steps that were taken in between.

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

35

Proceedings

When the defendant was building what he believed to be a thousand-pound bomb, what he had to do was fill trash bins with material. It smelled like ammonia. It was, you know, ammonium nitrate or anfo. And when he emptied these bags into trash bins, the trash bins were in a van. At the end, the defendant collected the bags because they had a residual amount of explosive material, and he took these empty bags and put them into the van because he thought this additional explosive could result in killing an additional person.

Finally, on the day of the attack, after the defendant armed the detonator and when he left the van that was parked by the Federal Reserve, he had to get out onto that street. It was a busy day in Manhattan in the morning, and he's walking by people just going to work, going about their day, living their life, people who had no idea what the defendant had planned. And when he gets into a hotel room in the financial district, he records a message of hate against America. And after having seen those people on the street, the defendant repeatedly dials a cell phone to explode his bomb.

I mean, the seriousness of the nature and circumstances of this offense are difficult to overstate. It has to be among the most serious attempt offenses that exists. Accordingly, the nature and circumstances of the offense

Proceedings                                          36

strongly weigh against the defendant's motion for a

non-guideline sentence and in favor of a guideline sentence.

With respect to the defendant's history and

characteristics, I'll be brief on this point, your Honor,

because much of the information that we have about the

defendant's characteristics comes from the offense conduct

that I just discussed.

Pursuant to Fernandez, the court should certainly

take into account the defendant's attempt to cooperate with

the government, even though it didn't result in substantial

assistance.  And we detail that attempt to cooperate in our

partially sealed submission, and we'll rely on that.

There's discussion about the defendant's childhood.

You know, we don't have any independent information on that.

What we know is, you know, with respect to the defendant's

stammer, however that affected him in his childhood and

whatever residual effects there were, we have hours of tape of

this defendant speaking with the UC.  The defendant doesn't

stammer on the tapes except in the most rare circumstance.  We

haven't played those tapes, frankly, because we want to

protect the identity of the undercover agent.  And we

proffered with the defendant on multiple times, and the only

time he stammered was when he got extremely excited.  But as a

general matter, in regular conversation, the stammer wasn't an

issue.

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

Proceedings                                      37

Defense counsel also discussed, you know, the defendant's family. And I don't know what the defendant's family's circumstances were, but certainly at this time it seems that the defendant had a very devoted family, a family far more devoted than many of the defendants that have to stand before your Honor routinely for sentencing. They sacrificed to send the defendant to the United States to go to school.

There's another instance where, you know, the defendant, his parents paid for him to go to some beach resort, where he was hanging out with, I guess, children of more wealthy families, and he resented the fact that he couldn't do the things that they did. How that all sorts out, I don't know how any of that can explain getting out on that street, walking by those people going to work and getting up there and trying to repeatedly detonate a thousand-pound bomb to make some political point. I don't know.

With respect to the discussion of the other cases, your Honor, you know, each case has to be evaluated under its own circumstances. We've detailed the cases. I would note that the JFK case, counsel's right that case went to trial. So it can be distinguished with respect to going to trial, but it was a source operation.

So based on the seriousness of the offense, based on the defendant's history and characteristics, the government

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

Proceedings                                                      38

strongly opposes a variance from the guidelines and submits

that a guideline sentence is appropriate here.

THE COURT:  Mr. Loonam, do you have any reason to

doubt that the remorse expressed by the defendant at this

stage is genuine?  Obviously, you've had a number of

opportunities to speak with him, as have the agents, in terms

of what you've referred to as proffer statements.  I clearly

understand everything that you are saying about the enormity

of this crime.  But as to that aspect, do you have any reason

to question that as of today, his remorse is genuine?

MR. LOONAM:   Your Honor, it's hard for me to opine

on that.  This is what I will say.  After the defendant was

arrested, immediately after he was arrested, he was very

polite with the agents and forthcoming in his statements, but

he maintained -- you know, he challenged the agents on U.S.

foreign policy and justified what he did based on foreign

policy, you know, based on America's foreign policy in Yemen,

for example.  You know, after the defendant was arraigned and

he met with us, the defendant again was very polite and

expressed remorse.  Whether it was remorse because he had been

caught or remorse because, you know, he reevaluated in that

short amount of time convictions that he held so seriously and

was willing to take such drastic action on, it's difficult for

me to look into his heart.  He certainly expressed remorse

during those meetings that we had.  He was polite with us.

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

Proceedings

What gives me some pause -- and again, I can't look into his heart -- is that while, you know, the letters from the defendant's family say that they didn't see this coming at all, they had no idea. He was always polite. He was always sort of -- you know, they never would have expected this from him. And when the agents, right after the defendant had dialed the phone to try to detonate the device, and the agents are debriefing him, the defendant's mother was calling him repeatedly because they were in regular contact throughout this entire period. The defendant's speaking with his mother, and she had no idea anything was going on, according to her letter. They wouldn't have expected this.

So based on all of that, it's difficult for me to say, you know, how to assess the defendant's remorse. He's expressed it to me. I know he's -- I think he's definitely not happy to be where he is right now. But, you know, again, it's difficult for me to look into his heart.

THE COURT: All right. Thank you.

Mr. Nafis, do you want to say anything before the court imposes sentence?

THE DEFENDANT: I'm ashamed. I'm lost. I tried to do a terrible thing. I alone am responsible for all I have done. Please forgive me. I'm really ashamed that I believed the radicals now. I know it's wrong. It's wrong. I'm really grateful that the agents saved me. They treated me with real

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

40

Proceedings

dignity.  And I apologize to you, your Honor.  I apologize to the people of America.  I apologize to New York City, especially.  I apologize to my parents.  I have failed them. I have broken their hearts.

Your Honor, please have mercy on me.  Please forgive me.  I'm really, really sorry, terribly sorry for all I've done.  Thank you.

THE COURT:  All right.  I have, of course, read the presentence report, the addenda to the report, the submissions by the government and the defense and considered the statements made in court today both by the defense and the government.

Procedurally, as I must, I have found the guideline range be 360 months or 30 years to life.  I recognize that under the case law regarding application of the guidelines, it is well known in this court and others that the court is not bound to follow a guideline range but can consider the factors that are set forth in 3553(a).  And of course, one of those factors set forth there is, in fact, the guideline range.

Turning to a consideration of those factors, while I've considered all of the factors, I will elaborate on several:

First, the nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law and

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

41

Proceedings

to provide just punishment. The seriousness of the offense to which this defendant entered his guilty plea is perhaps exceeded only by the offense he would have committed had this plot been successful. The defendant's goal was to detonate a thousand pounds of explosives outside of the Federal Reserve Bank, destroying that building, killing its inhabitants as well as the unfortunate men, women and children who may have been in the vicinity. Thankfully, in pursuing his goal, he encountered sources and an undercover agent of the Federal Bureau of Investigation. Indeed, today even the defendant purports to be grateful for that fact.

I am persuaded that the defendant was a serious threat to the safety of New Yorkers, Americans and that he would have executed this plan or a similar, perhaps less grand one, had he not been discovered by the men and women of both our federal law enforcement and local law enforcement communities who work so tirelessly to protect us from plots fostered by the very type of blind hatred that influenced this defendant.

I have to consider the history and characteristics of the accused. And counsel, with support of a psychological report, has pointed to a constellation of psychological problems of the defendant, which it's suggested were created by strict upbringing, an abusive uncle, stuttering that led him to feelings of worthlessness and inferiority. I don't

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

42

Proceedings

doubt that these problems may have made him a vulnerable target for the jihadist rhetoric.  And it's clear to today, even today, that he is clearly impressionable, having a belief changed in a matter of months from an avowed terrorist to one celebrating the freedoms of the American way of life.

It is obviously difficult to know, but I don't believe him now to be the hardened radical Islamic terrorist.  Certainly, his recent public statements would not endear him to the followers of that cause.  Whether he could return to that camp simply cannot be known.  I am prepared to accept that the remorse that he expresses is genuine.

Having said that, and while I've considered these factors, it does not change the fact that he was sentient when he was engaged in efforts to destroy the inhabitants of the Federal Reserve Bank and the people outside.  He knew exactly what he was doing.  This is not a case where he was only in the preparatory stages of an attack, in a situation where one might be left to wonder whether or not he would have gone through with it.  We have no doubt about this in this case because he continually dialed the cell phone number that he thought would activate the device.  I have no doubt that had he been successful, the family members of the victims of this bombing would have taken little solace in the fact that the architect of the plot that killed their loved ones was someone who was impressionable.

43

Proceedings

I recognize that the court must consider the history and characteristics of the defendant. I have done that, but I have to consider that together with the need to promote respect for the law and impose a sentence that is just, one not too lenient or one not too severe. In the language of 3553, one that is sufficient but not greater than necessary to comply with the policy factors set forth in that statute.

Where to draw the line in a case like this is an extraordinarily difficult task. In most cases, it is a difficult task, possibly the most difficult task that judges face, one that takes much thought and is often reached in consultation with colleagues.

There are other factors set forth in that statute: The need for adequate deterrence, the need to deter the defendant from any future actions such as this, a concept of general deterrence. Perhaps nothing would deter those hardened to do this type of activity, but heavy sentences would, no doubt, deter impressionable people, perhaps such as Mr. Nafis, to think twice about engaging in this type of conduct. There has been the need to protect the public from further crimes of the defendant. Certainly a substantial sentence would have that effect.

Also, the court has to consider, and it's been talked about here, the need to avoid unwarranted sentencing disparities among defendants with similar records and similar

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

Proceedings

conduct.  The parties have pointed out sentences ranging from, at the low end, 23 years to, at the high end, 35 years.

The government in this case has requested a guideline sentence.  Having considered all of the factors in this case, I think that their request for a guideline sentence is entirely justified by a consideration, balancing all of the factors that I have talked about and that the law requires me to consider.  I think that there are factors when the court is called upon to determine where within that guideline range courts should select a sentence.

I think that the important factors there that have been pointed out and have in effect been conceded as important by the government are the efforts that this defendant engaged in to cooperate with the government.

Considering that and considering the other sentences that have been made referenced to and a need to avoid unwarranted sentence disparity and all the other factors that I have articulated and considered, I'm going to sentence the defendant to the custody of the Bureau of Prisons for a period of 360 months, 30 years, to be followed by a lifetime term of supervised release with the condition that if removed from this country, he not reenter the United States illegally. That he not posses a firearm, ammunition or destructive device.  And that he not associate in person, mail or electronic mail, internet, social media or telephone with

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

Proceedings

individuals who have an affiliation with terrorists or organized crime groups.

I'll impose a $100 special assessment. I won't further impose a fine. It doesn't appear that the defendant has any capacity to pay a fine.

Is there anything further?

MR. LOONAM: Your Honor, the government moves to dismiss the open count.

THE COURT: That application is granted.

Does the plea agreement waive his right to appeal, Ms. Cesare?

MS. CESARE: Yes.

THE COURT: I believe, Mr. Nafis, that you -- according to the terms of the agreement you've reached with the government, you have waived your right to appeal. If I was incorrect about that, any notice of appeal of this sentence would have to be filed within 14 days.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Is there anything else?

MR. LOONAM: Nothing from the government.

THE COURT: Ms. Cesare?

MS. CESARE: No, thank you.

JUDI JOHNSON, RMR, RPR, CRR, CLR
Official Court Reporter

Proceedings

CERTIFICATE OF REPORTER.

I certify that the foregoing is a correct transcript of the

record of proceedings in the above-entitled matter.


_____

Judi Johnson, RMR, RPR, CRR, CLR
Official Court Reporter

47

Proceedings