FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ OCT 15 2020 ★
BROOKLYN OFFICE

RECEIVED
OCT 15 2020
PRO SE OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

QUAZI MOHAMMAD REZWANUL AHSAN NAFIS,

    Movant,

v.

UNITED STATES OF AMERICA,

    Respondent,

Criminal Docket No. 12-720 (CBA)

---

## MOTION FOR COMPASSIONATE RELEASE/REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C. 3582(c)(1)(A)(i) - IN AN EXTRAORDINARY AND COMPELLING CIRCUMSTANCE

Comes now, Quazi Nafis, pro-se (herein after Nafis or Movant) invoking this honorable Court under 18 U.S.C. 3582(c)(1)(A)(i) - Motion for Compassionate release/reduction in sentence. In deciding whether to file a Motion under either 18 U.S.C. 4205(g) or 18 U.S.C. 3582, the Bureau of Prisons (BOP) should consider whether the inmates release would pose a danger to the safety of any other person or the community. 18 U.S.C. 3582 was amended by the First Step Act of 2018, revision noted below summary of changes. (A) A request for Motion under 18 U.S.C. 4205(g) or 3582(c)(1)(A) shall be submitted to the Warden. The inmate request shall at a minimum contain the following information:

(1) The extraordinary or compelling circumstances that the inmate believes warrant consideration.

(2) Proposed release plans, including where the inmate will reside, how the inmate will support himself, and if the basis for the request involves the inmates health, information on where the inmate will receive medical treatment, and how the inmate will pay for such treatment.

(b) Staff shall refer a request received at Central Office to the Warden of the institution where the inmate is confined.

## Procedural History

The Movant came to the United States of America on January 2012, on a student visa via 'Bangladesh'. He was enrolled at Missouri State University in 'Girardeau, Missouri' where he wanted to study Cyber Security. Within a month or two, 'Nafis' received a notice from the Bangladesh University that he had been placed on suspension, although he continued to go to classes in the U.S. He was not excelling in classes and was failing in his work. At the end of the semester, in May of 2012, he was also placed on suspension by Missouri State University. He became depressed and began going on Facebook and started speaking with individuals who were of a radical Islamic ideology.

He moved to 'Albany, New York' where he was staying with an uncle and at the same time trying to find employment. He continued to feel depressed and spent most of his time to himself. He continued to watch radicalized Islamist videos on Facebook, and interacted with them at times. During this period, on Facebook he met someone named 'Yaqeen' who shared in radicalized Islamist views. Then he encountered another individual by the name of 'Dawud'. In this time-frame 'Syria' was going through a civil war and Sunni-Muslims were being killed brutally by the Syrian government.

The Movant wanted to go there to aid the oppressed muslims there. 'Dawud' told the Movant that he knew someone who could help him get to Syria and gave 'Nafis' a phone number to a guy by the name of 'Kareem' (undercover agent). "Kareem" told 'Nafis' that he was an Al-Qaidah Agent. We met on several occasions, and on the first or second meeting, 'Kareem' stated that we can do something here (meaning United States), when I had no intentions to do anything here. 'Kareem' also instructed the Movant to find out what he can do himself. 'Yaqeen' would always inspire the Movant through social media as the Undercover Agent acted as a elder brother. In the end 'Kareem' wanted to work with me, and the target that I picked was the 'Federal Reserve Building' of New York. 'Kareem' then instructed 'Nafis' to find a store house, but he ended up finding the store house himself. "Kareem" then brought some inert explosives, driving in a van where he placed the inert explosives and the van in the store house. 'Kareem' also bought some barrels from 'Home Depot' that he left in the store house. He gave the Movant some money to buy two cell phones to detonate the bomb. 'Nafis' bought the two cell phones, and 'Kareem' took one to make a detonater and left one with me. On October 17, 2012, 'Nafis' woke up at 4:00 AM, "Kareem" picked me up in the van he was driving and we went to the store house.

At the store house we unpoured the bags filled with inert explosives into the barrels that were placed on the back of the van. 'Kareem' attached the detonater with the bomb, and he drove the van to the 'Federal Reserve of New York' and parked it by the side way. 'Kareem' then took me to a hotel room, I had the other cell phone with me, and he told me to make a call on the cell phone attached to the explosives to detonate the bomb. I made the call, someone knocked on the door to the hotel room, 'Kareem' opened the door and it was the 'FBI' and I was then arrested.

'Mr. Nafis' was indicted in the Eastern District of New York and charged with 'Attempt to Use a Weapon of Mass Destruction, in violation of 18 U.S.C. 2332A(A)(2). 'Nafis' pleaded guilty to Attempt to Use a Weapon of Mass Destruction, and on August 9, 2013 the District Court sentenced the movant to 360 months / 30 years.

(1) <u>EXTRAORDINARY AND COMPELLING CIRCUMSTANCES</u>

After the United States Supreme Court decision in <u>"Johnson"</u> (2015) stating that the residual clause of 18 U.S.C. 924(e), which defines a crime of violence is unconstitutionally void and vague, in every U.S.S.G. manual thereafter (2016, 2017, 2018) the guideline statue <u>"2K1.4"</u> has been removed from the guidelines.

In the Presentence Investigation Report paragraph 52: it states Base offense level for 18 USC 2332A(A)(2) is U.S.S.G. 2K1.4. The cross-reference at <u>2K1.4(C)(2)</u> instructs that if the offense was intended to cause death or serious bodily injury, apply the most analogous guideline from chapter 2, part A. As the offense involved the premeditated attempted killing of numerous individuals, the most analogous guideline is <u>U.S.S.G. 2A2.1(A)(1)</u> (Attempted Murder). As the offense would have constituted first degree murder, the base offense level is 33, per U.S.S.G. <u>2A2.1(A)(1)</u>.33.

Since the abragation of U.S.S.G. <u>2K1.4</u> cross reference instructions, the appropriate vehical to cure the remedy, falls under 1B1.3 Relevant Conduct (factors that determine the guideline range) 6. (A) <u>Definition of Harm</u> - "Harm that includes bodily injury, monetary loss, property damage, and any resulting harm. (B) <u>Risk or danger of Harm</u> - "If the offense guideline includes creating a risk or danger of harm as a specific offense characteristic, whether that risk or danger was created is to be considered in determining the offense level. <u>See, e.g.</u> 2K1.4 (arson, property damage by use of explosives); If however, the guideline refers only to harm sustained use (e.g. 2A2.2 (aggravated assault) where the base offense level starts at 14. <u>United States v. Ansberry</u> (no. 19-1048) (10th cir. Sept. 23, 2020) (vacated on §§ 2K1.4(A)(1), and 3A1.4, etc.)

(3)

Because U.S.S.G. 2K1.4 has been Abrogated, it is only right under the rule of lenity that 'Mr. Nafis' be resentenced under the U.S.S.G. 2A2.2 (Aggravated Assault).

In the instant case, there are no victims (1); and the explosives were fake (2); and the movant was enticed by the Undercover (FBI) Agents to pull off a crime in the United States. The Undercover (FBI) Agents went so far into the entrapment, that they provided everything to perpetrate the alledged crime, (van, fake explosives, storehouse, and money to buy cellular phones, etc.) (3).

## Jurisdiction

The First Step Act also Amended 18 U.S.C. 3582. In Section 603 of the Act, Congress Amended 3582(c)(1)(A) to permit defendants to move a sentencing Court for modification of sentence "After the defendant has fully exhausted all administrative rights to Appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the Warden of the defendant's facility, whichever is earlier[.]

Section 3582(c)(1)(A) provides in pertinent part:

[T]he Court... may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in Section 3553(A) to the extent that they are applicable, if it finds that

(i) extraordinary and compelling reasons warrant such a reduction;
and that such a reduction is consistent with applicable policy statments issued by the Sentencing Commission[.]

In a plea agreement, 'Nafis' received a 360 months/30 year term for violating Federal Statute 18 U.S.C. 2332A(A)(2) - Attempt to use a Weapon of Mass destruction on August 9, 2013. If he was sentenced after <u>Johnson v. United States</u>, 135 S.Ct. 2251 (2015), and <u>Sessions v. Dimaya</u>, 138 S.Ct. 2251 (2018), the thirty year sentence he is serving is longer than the sentence he would receive if he was sentenced under the law as it now exists.

In 2015, The Supreme Court held in <u>Johnson</u> supra., that the residual clause of 18 U.S.C. §924(e) was unconstitutional vague and a violation of Due Process. Under the Armed Career Criminal

(4)

("ACCA"), a violent felony" was defined as a crime punishable by imprisonment for a term exceeding one year that (1) has an element the use, attempted use, or threatened use of physical force against the person of another; or (2) is burglary, arson, extortion, involves the use of explosive, or otherwise involves conduct that presents a serious potential risk of physical injury to another. 18 U.S.C. § 924(e)(2)(B)(i)-(ii).

In the instant case, Nafis' base offense level for Attempt to use a weapon of mass destruction 18 U.S.C. 2332A(a)(2) came from the cross-reference at 2K1.4(c)(1) which has been abrogated since the Supreme Court decision on (2015) with Johnson. In paragraph 52 of Nafis' Presentence Investigation report it stated: 2K1.4(c)(1) instructs that if the offense was intended to cause death or serious bodily injury, apply the most analogus guideline from chapter 2, part A. As the offense involved the premeditated attempted killing of numerous individuals, the most analogous guideline is U.S.S.G. 2A2.1.(A)(1) (Attempted Murder). As the offense would have constituted first degree murder, the base offense level is 33, per U.S.S.G. 2A2.1(A)(1). 33

The language found to be void for vagueness by the Supreme Court was the clause "or otherwise involves conduct that presents a serious potential risk of physical injury to another. Generally, new constitutional rules of criminal procedure do not apply retroactively. However, new substantive rules do apply retroactively. Decisions invalidating substantive criminal statutes that impose additional or an increased punishment on a defendant; or statutes that defines or clarify criminal offenses are substantive. See Bousley v. United States, 523 U.S. 614 (1998) (which addressed the retroactivity of an earlier Supreme Court decision interpreting § 924(c); Welch v. United States, 136 S.Ct. 1257, 1262 (2016). In Welch, the Supreme Court held that Johnson was a substantive rule which "has retroactive effect under Teague v. Lane, 489 U.S. 288 (1989)] in cases on collateral review." 136 S.Ct. at 1265. Therefore, the substantive rule announced in Johnson applies retroactively to all cases of the ACCA.

I. Factors set forth in 3553(A)

A reduction of the movant's sentence on the 'Attempt to use Weapons of Mass Destruction count, is consistent with all the factors set forth in 18 U.S.C. 3553(A), and especially 3553(A)(2)(A) ("the need for the sentence imposed ... to reflect the seriousness

of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(6) ("the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

II. Consistency with Applicable Sentencing Commission Policy Statements

U.S.S.G. 1B1.13 and related Commentary from the Sentencing Commission were most recently updated on November 1, 2018, before the effective date of the First Step Act December 21, 2018. Accordingly, the Guideline and Commentary still presume that a motion for reduction in sentence under 3582(c)(1)(A) must be made upon motion of the Director of the Bureau of Prisons.

The Commentary describes certain circumstances under which "extraordinary and compelling reasons" for a reduction in sentence are deemed to exist, but the Commentary does not suggest the list is exclusive. Application Note 1(D), titled "Other Reasons" is a catch-all provision, noting that the Director may determine "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." Application Note 3 states that "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement," mirroring the language of 28 U.S.C. 994(t). In Application Note 4, the Commission encourages the Director to file a motion for reduction of sentence if a defendant meets any of the circumstances set forth in Application Note 1, thereby allowing a court to consider 3553(a) factors, as well as criteria in the Commission's policy statement such as whether a defendant is a danger to the safety of any other person or to the community, when determining whether to reduce a term of imprisonment.

Other courts have concluded that the Commission's failure to amend Guideline 1B1.13 and related Commentary following the First Step Act does not preclude a court from acting on motions for sentence reductions or using the catch-all provision in Application Note 1(D). See: Brown, 2019 U.S. Dist. Lexis 175424, 2019 WL 4942051, at *3-4 (citing United States v. Beck, No. 1:13-CR-186-6, 2019 U.S. Dist. Lexis 108542,

2019 WL 2716505, At *5 (M.D.N.C. June 28, 2019); United States v. Cantu, No. 1:05-CR-458-1, 2019 U.S. Dist. Lexis 100923, 2019 WL 2498923, At *5 (S.D. Tex. June 17, 2019); United States v. Fox, No. 2:14-CR-03-DBH, 2019 U.S. Dist. Lexis 115388, 2019 WL 3046086, At *3 (D. Me. July 11, 2019)).

## III. Extraordinary And Compelling Reasons For A Sentence Reduction

A. 'Nafis' pleaded guilty to an offense, (Attempt to use a weapon of mass destruction, 18 U.S.C. 2332(A)(A)(2)) in which he received a thirty-year/360 month sentence based off of the cross-reference of 2K1.4(c)(1) which has been abrogated by the United States Supreme Court decision in Johnson v. United States, 135 S.Ct. 2251 (2015), which found that the residual clause of 18 U.S.C. 924(e) which defines a crime of violence (is burglary, arson, extortion, involves the use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.) to be unconstitutionally void and vague. Without the now void and vague enhancement of U.S.S.G. 2K1.4(c)(1), 'Nafis' sentence would drop tremendously. The Supreme Court also made 'Johnson' retroactive.

B. 'Mr. Nafis' committed his crime at the tender age of twenty-one (21) years old. In an independent Psychiatric Evaluation of 'Nafis' prior to his conviction and sentencing, a Doctor 'Richard B. Krueger, M.D.' in a report dated June 27, 2013, "It is my opinion, to a reasonable degree of medical certainty that Mr. Nafis had stuttering as a child, which is significantly improved now, depression, dysthymia, and post-traumatic stress disorder made him vulnerable to external influences." United States v. Zullo (19-32-18-cr) (2nd Cir. Sept. 25, 2020).
    At (21), his brain was not fully developed. Contemporary neuroscience confirms that Adolescence - and the associated lack of maturity, underdeveloped sense of responsibility, recklessness, impulsivity and heedless risk taking does not end at 18. Research pioneered by Dr. Laurence Steinberg, Distinguished University Professor of Psychology, Temple University, demonstrates that the human brain undergoes a "massive reorganization" during the teenage years. These changes are both structural and functional and make adolescence a stage of life biologically distinct from childhood and adulthood. Although the brain's logical capabilities are generally formed at 16, the systems controlling more complex judgments - such as risk/reward evaluations, responses to

enviromental stressors, and impulse control - do not completely develop until the mid-twenties.

As the adolescent brain matures, it undergoes a temporary developmental imbalance between two neurobiological systems: the limbic system, associated with emotions and reward seeking, and the prefrontal regulatory system, which governs rational judgment and impulse control. During early and middle adolescence, the limbic system experiences a "rapid and dramatic increase in dopaminergic activity," causing a marked increase in reward seeking, sensation seeking, and accompanying risky behavior. The reward centers of the adolescent brain are more active than those of adults, leading to an overestimation of rewards versus risks. Zullo, Id (showing court can consider any reason for compassion release).

At the same time, "compelling neurobiological evidence" demonstrates that the brain's regulatory system undergoes a more gradual, linear maturation over the course of adolescence. This means that adolescents have a qualitatively higher neurological inclination to engage in risky activity, while at the same time they have a qualitatively lower ability to control impulses or accurately assess future consequences." Adolescents develop an accelerator a long time before they can steer and brake. The ability to regulate and assess increases gradually as adolescents age.

Studies further show that emotionally-charged situations exacerbate this discrepancy, leaving teenagers - especially young men - even less able to exercise the regulatory functions of the brain in the very contexts when those moderating functions are most needed. While young men may be good at "cold reasoning," their ability to reason at times of stress and excitement - "hot reasoning" - remains undeveloped and immature. Laurence Steinberg (supra). The American Bar Association has relied upon this change in neuroscience as the reason for it's Resolution 111, which "urges each jurisdiction that imposes capital punishment to prohibit the imposition of a death sentence on or execution of any individual who was (21) years or younger at the time of the offense." The resolution explains its rationale as based on "Findings [that] demonstrate that 18 to 21 year olds have a diminished capacity to understand the consequences of their actions and control their behavior in ways similar to youth under 18". Additionally, research suggests that late adolescents, like juveniles, are more prone to risk-taking and that they act more impulsively than older adults in ways that likely influence their

criminal conduct. Nor are "18 to 21 year olds...fully mature enough to anticipate future consequences." 80 Child Dev. 28,35 (2009) Supra.

As in the instant case, 'Mr. Nafis' who was twenty-one years old at the time of the offense, was not functioning as an adult with an adult state of mind. But rather as a teenager, and today is remorseful and learned from his mistake.

(2) <u>PROPOSED RELEASED PLANS</u> - During my incarceration, I've been a model inmate with only two incident reports.

'Mr. Nafis' has now been incarcerated for (7 years and 10 months), and upon release he intends on being deported back to his native country of Bangladesh, which upon return he will go back to college and get a bachelors degree in software engineering. My father, mother, sister, and cousin awaits me. I hope to provide for them, and one day get married and have kids and start my own family. While being incarcerated I have used my time to educate myself by taking the following classes: FCI Microsoft, Typing instructor, FCI workkeys, Aids Awareness, At Risk Wellness Program, Get Right with your taxes, Money Management Skills, Employment Skills, Public Speaking, just to name a few. I feel remorse for the crime that landed me in prison, and I hate the fact that I had been manipulated and exposed to radical Islam. In the future I want to write a book to warn others of the danger of radical islam that almost brought me to destruction. I also work as a mental health companion.

<u>Conclusion</u>

By accepting the plea offer that was presented to me, I agreed to be deported back to my native country upon completion of my sentence, the movant is asking this Court to terminate the remainder of his sentence. Without the <u>2K1.4(c)(1)</u> enhancement, the movant's guideline range would start in Category I, Level 14, which would equate to time serve. The movant prays that this Court gives him the relief he seeks or any other relief it deems fit. In good faith!

Respectfully Submitted,

/s/ Quazi Mohammad Nafis

/D/ October 8, 2020

(9)

⇨ 81710-053 ⇨
Quazi Nafis
#81710-053
Federal Correctional Institution
P.O. Box 725
Edgefield, SC 29824-0725
United States

Federal Prison
P.O. Box 725
Edgefield, SC 29824

LEGAL/SPECIAL MAIL: The enclosed letter forwarded to you was processed using special mail procedures. The letter was neither opened/inspected. If the writer has a question/problem over which this facility has jurisdiction, you may return the materials for further information/clarification. If the writer encloses correspondence for forwarding to another addressee, please return enclosure to the above address.

Initials ___STH___ Date _10-8-20_



Legal

