

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

RMT                                    *271 Cadman Plaza East*
F.#2012R01575                          *Brooklyn, New York 11201*

November 13, 2020

<u>By Hand Delivery and ECF</u>

The Honorable Carol Bagley Amon
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:   United States v. Quazi Mohammad Rezwanul Ahsan Nafis
            <u>Criminal Docket No. 12-720 (CBA)             </u>

Dear Judge Amon:

       The government respectfully submits this letter in opposition to the defendant's motion for early release filed on October 15, 2020 (ECF #57 (the "App.")).  For the reasons set forth below, this application should be denied.

I.     <u>Summary of the Offense Conduct[1]</u>

       Quazi Mohammad Rezwanul Ahsan Nafis (hereinafter "Nafis") is a Bangladeshi citizen who entered the United States from Bangladesh on a student visa in January 2012.  Prior to traveling to the United States, Nafis formed strong anti-American views.  Nafis believed, among other things, that the United States was responsible for killing and raping Muslims all over the world.  He also believed that the United States used its economic power to make puppets of governments in Muslim countries.  While in Bangladesh, Nafis decided to take action based on his religious and political views.  According to recorded statements, which Nafis repeatedly made during the course of the investigation, he came to the United States for the specific purpose of conducting a terrorist attack.   To this end, prior to coming to the United States, Nafis acquired operable bomb-making instructions and brought these instructions with him to the United States.  He also

---

     [1] The facts contained herein are drawn from the Presentence Investigation Report, as well as the government's sentencing memorandum filed in this matter on August 1, 2013 (ECF #29).

brought lectures from Anwar al-Awlaki, the deceased leader of al-Qaeda in the Arabian
Peninsula ("AQAP").

Within months of arriving in the United States, Nafis used and attempted to
use the internet to recruit like-minded individuals to help him carry out a terrorist attack.
One of the individuals Nafis contacted was a radical Islamist known to Nafis as "Yaqueen."
Yaqueen proposed attacking a military base in Baltimore that he was familiar with, but Nafis
insisted that the target of the attack would need to have a higher public profile to be effective.
Nafis indicated that he wanted his attack to result in "mass destruction" without regard to
whether the victims were military or civilian.  Nafis also contacted another individual in the
United States known to Nafis as "Fahim."  Nafis repeatedly attempted to recruit Fahim to
participate in a terrorist attack, but Fahim declined to join Nafis's plan.  Nafis also reached
out to individuals overseas to assist him in his plan.  In recorded statements, Nafis reported
that he had contacts overseas, including al-Qaeda members, who could assist him in carrying
out a terrorist attack.

Fortunately, Nafis reached out to an FBI confidential human source (the
"CHS") through the internet to recruit the CHS into his (Nafis's) jihadist cell.  Nafis told the
CHS that he admired Usama bin Laden, and that he traveled to the United States to wage
jihad.  Nafis also told the CHS that he was in contact with a "brother" in Bangladesh.  Nafis
discussed becoming a martyr with the CHS, and told the CHS that he (Nafis) had obtained an
Islamic ruling from an individual in Bangladesh blessing his plan to conduct a terrorist attack
inside the United States.

Based on, among other things, Nafis's aggressive attempts to recruit radical
individuals into a jihadist cell, his statements concerning his intentions to conduct a terrorist
attack, his connections overseas, and indications that he possessed bomb-making instructions
(which later proved correct), the FBI and the U.S. Attorney's Office decided to conduct a
sting operation.

Pursuant to the sting operation, the CHS offered Nafis an opportunity to meet
with an al-Qaeda facilitator in the United States who could help carry out his plan, if he so
wished.  Nafis eagerly and emphatically expressed his desire to meet with this purported al-
Qaeda facilitator.  Nafis was told to contact the purported al-Qaeda facilitator only if he was
ready to carry out a terrorist attack.  Nafis indicated he was ready and took the step of
contacting the purported al-Qaeda facilitator.  In no uncertain terms, Nafis stated that he
wanted assistance from al-Qaeda in launching a terrorist attack in the United States.

On July 19, 2012, an undercover law enforcement officer posing as an al-
Qaeda member and facilitator (the "UC"), spoke with Nafis and arranged a meeting in
Central Park several days later.  On July 24, 2012, Nafis met the UC in Central Park.  During
that meeting, Nafis told the UC, in sum and substance, that he wished to launch a terrorist
attack against the United States.  Nafis further told the UC, in sum and substance, that he was
collaborating with two other individuals – referring to Yaqueen and the CHS – and that those

2

individuals also wanted to participate in the attack. Nafis stated, "We are ready for action." Nafis then said, in sum and substance, that he, Yaqueen and the CHS "don't care anything about our work. We just want to meet our lord as soon as we can." Nafis continued:

> What I really mean, is that I don't want something that's like, small. I just want something big. Something very big. Very very very very big, that will shake the whole country, that will make America, not one step ahead, change of policy, and make one step ahead, for the Muslims . . . that will make us one step closer to run the whole world . . . .

On August 5, 2012, Nafis told the UC, in sum and substance, that Nafis was considering the New York Stock Exchange as a possible target. On August 9, 2012, FBI agents conducting surveillance of Nafis observed him in the area of the Stock Exchange, apparently as part of Nafis's efforts to assess its suitability as a target. Surveillance agents also observed Nafis appearing to take notes while he was in the area of the Stock Exchange.

On August 11, 2012, Nafis met with the UC in a hotel room in Queens, New York. During that meeting, Nafis confirmed that he wanted to target the financial district of Manhattan – specifically, the New York Stock Exchange. Nafis told the UC, in sum and substance, that he wanted to use explosives as part of a suicide attack, either contained in one or more cars, or strapped to his person. Nafis explained, "We are going to need a lot of TNT or dynamite." Nafis also provided the UC with a handwritten map of the area that Nafis had apparently prepared while scouting the area around the Stock Exchange on August 9, 2012. Nafis asked the UC whether approval for Nafis's proposed attack would come from the "top" of the al-Qaeda leadership. The UC responded, in sum and substance, that he was going to meet with al-Qaeda leadership and advise them about Nafis's plan. Nafis and the UC then traveled to the financial district in Manhattan, and Nafis took several photographs of prospective targets in that area.

On August 23, 2012, Nafis again met with the UC in a hotel room in Queens, New York. Just a few minutes after arriving at that meeting, Nafis asked, "The thing that I want to ask you about is that, the thing that I'm doing, is it under al-Qaeda?" The UC responded in the affirmative. The UC subsequently asked Nafis what Nafis needed to carry out his proposed attack, and Nafis explained that he needed a "big car with lots of fruits and vegetables in there which can blow up the whole New York Stock Exchange building." Nafis added that he needed "to make sure that this building is gone." Nafis told the UC that he understood and was committed to al-Qaeda's ideology. Nafis also asked the UC why the UC did not join him in carrying out the attack. Nafis asked, "Can I ask you something? Why aren't you (inaudible) to drive the car yourself? Why don't you want to be shahid[martyr]?" The UC responded, in sum and substance, that it was his role to facilitate Nafis's attack. At the conclusion of that August 23, 2012 meeting, the UC advised Nafis that the UC was going to travel overseas to meet with al-Qaeda leadership to discuss Nafis's

proposed attack.  The UC further told Nafis that the UC would contact Nafis again when the UC returned.

On August 26, 2012, FBI agents performing surveillance again observed Nafis in the area of the financial district, apparently again for the purpose of scouting the location for his proposed attack.

The next day, on August 27, 2012, Nafis told the CHS that he believed that he (Nafis) was now a member of al-Qaeda and that they were obtaining final approvals for the attack from al-Qaeda leadership.  Later during the same discussion, Nafis told the CHS, in sum and substance, that his upcoming attack was going to be a "one man job," indicating that Nafis did not want the CHS or Yaqueen to be directly involved in Nafis's attack on the financial district.  Nafis and the CHS then discussed how the CHS and Yaqueen might launch their own attacks after Nafis's attack was complete.

On September 15, 2012, following the UC's purported return to the United States, Nafis again met with the UC in a hotel room in Queens, New York.  During that meeting, Nafis told the UC, in sum and substance, that he wanted to launch an attack on the financial district involving explosive devices in multiple cars with other individuals participating in the attack.  Nafis also confirmed that he was ready to kill himself during the course of the attack, but indicated that he wanted to return to Bangladesh to see his family one last time to set his affairs in order.  In addition, Nafis told the UC that, for operational reasons, he was considering attacking the Federal Reserve Bank instead of, or in addition to, the New York Stock Exchange.  Nafis also told the UC, in sum and substance, that he understood that the attack he was planning would result in a large number of civilian casualties, including of women and children, but still wanted to proceed with the attack.

On September 20, 2012, Nafis once again told the UC that he wanted to return to Bangladesh prior to launching his suicide attack in the United States to set his affairs in order.  The UC responded, in sum and substance, that Nafis was free to return to Bangladesh at any time, but that if he did so, he could not participate in the attack due to security concerns.  Nafis reacted with frustration and anger to the UC's position.  During a subsequent telephone call on September 23, 2012, Nafis urged the UC, in sum and substance, to remind the al-Qaeda leadership both that Nafis had come up with the attack plan himself, and that he had specifically traveled to the United States for the purpose of conducting a terrorist attack.

On September 27, 2012, Nafis again met with the UC.  At the beginning of that meeting, the UC explained to Nafis, in sum and substance, that the al-Qaeda leaders with whom the UC had purportedly consulted at Nafis's request would not wait for Nafis to return from Bangladesh before carrying out the attack due to operational security concerns.  However, they had authorized Nafis to use a remote controlled explosive device, rather than launching a suicide attack.  The UC explained that as a result, Nafis could participate in the attack, if he so wished, and later return to Bangladesh to set his affairs in order.  The UC then

4

asked Nafis whether Nafis wanted to continue to move forward with the plot, and Nafis repeatedly confirmed that he was committed to carrying out an attack on the financial district. Indeed, Nafis was excited by the new plan to detonate the explosive device remotely because, he indicated, it would allow him to conduct additional terrorist attacks on U.S. soil.

On October 4, 2012, Nafis and the UC met and traveled to a warehouse in the Eastern District of New York (the "Warehouse"). Prior to that meeting, Nafis had obtained numerous items for use in the explosive device at the UC's request, including batteries and other electrical components. During the meeting, Nafis and the UC purchased additional components to construct the explosive device, including large garbage bins to contain the purported explosive material. Nafis told the UC, in sum and substance, that they should return to the financial district during their next meeting to finalize exactly how they would carry out the attack and escape. Nafis told the UC: "We need to make a very concrete plan." In addition, when the UC asked whether Nafis was ready to proceed with the attack, Nafis responded: "There is nothing stopping me."

On October 12, 2012, Nafis and the UC met and transported what Nafis believed to be explosive material to the Warehouse. Upon arriving at the Warehouse, Nafis and the UC offloaded approximately twenty fifty-pound bags of this purported explosive material into a trailer. Nafis also gave the UC a tarp that he had previously purchased to cover the purported explosive device when it was placed in the van. Nafis also provided the UC with a thumb drive containing an article Nafis had written about his motivations for his attack. Nafis believed that this article would be published by Inspire magazine. In that article, Nafis included quotations from "[o]ur beloved Sheikh Osama bin Laden" to justify the fact that his plot likely involved the killing of women and children. Nafis also stated the following:

> all I had in my mind are how to destroy America . . . I came up to this conclusion that targeting America's economy is most efficient way to draw the path of obliteration of America as well as the path of establishment of Khilapha[caliphate].

> I decided to attack the Federal Reserve bank of New York which is by far the largest (by assets), most active (by volume) and most influential of the 12 regional Federal Reserve Banks. New York Federal Reserve Bank implements monetary policy, supervises and regulates financial institutions and helps maintain the nation's payment systems.

Shortly after this October 12, 2012 meeting, Nafis called the UC and informed the UC that he had purchased a second mobile telephone that Nafis would use to place the cellular telephone call to trigger the detonator for the bomb.

On October 13, 2012, as previously suggested by Nafis, Nafis and the UC returned to the financial district so Nafis could scout the site for his upcoming attack. During the drive to the financial district, Nafis plugged the thumb drive into his computer and read aloud his article that he intended to be published in Inspire.

On October 15, 2012, the UC called Nafis and advised that they would be ready to proceed with the attack on October 17, 2012. Nafis agreed and indicated, in sum and substance, that he was eager to proceed with the attack on that day. The next evening, on October 16, 2012, Nafis called the UC and stated, in sum and substance, that he wanted to "add something" to the planned attack, and that he wanted the attack "to happen, no matter what."

In the early morning of October 17, 2012, Nafis and the UC met and drove to the Warehouse in a van (the "Vehicle"). During this drive to the Warehouse, Nafis told the UC, in sum and substance, that he had a "Plan B," which involved changing the attack into a suicide bombing operation in the event that Nafis believed the attack was about to be thwarted by police. After arriving at the Warehouse, Nafis assembled the purported one thousand pound explosive device, pouring the bags containing the inert explosive material into the trash bins and placing them inside the Vehicle. He also installed components for the purported detonator. As Nafis and the UC prepared to leave the Warehouse, Nafis collected the empty bags that had contained the inert explosive material and placed them in the van. Nafis then told the UC, in sum and substance, that he was collecting the extra bags because he believed that there might be residual explosive materials in the bags that would contribute to the strength of the anticipated detonation and kill more people.

The UC then drove the Vehicle from the Warehouse with Nafis in the passenger seat to the New York Federal Reserve Bank. During this drive, Nafis explained that his jihadist views were shaped, in part, by videotaped sermons of Anwar al-Awlaki. In addition, Nafis told the UC that he wanted to record a video statement prior to detonating the device. Before entering Manhattan, Nafis armed the purported explosive device for detonation by turning on the cellular phone to be used in the detonator, installing the battery in the detonator and connecting the wires linking the detonator to the purported explosive materials.

Upon arriving at the New York Federal Reserve Bank, Nafis and the UC parked the Vehicle, exited, and walked to a nearby hotel. Once inside a room at the hotel, Nafis told the UC to film a video statement Nafis wanted to make concerning the attack. During a video recorded statement to the American public, Nafis stated: "We will not stop until we attain victory or martyrdom."

While making his video statement, Nafis covered his face, wore sunglasses, and disguised his voice. After completing the video, Nafis repeatedly attempted to detonate the purported bomb by placing multiple telephone calls to the cellular telephone that he had installed as the initiating device for the detonator. By placing these calls, Nafis was

attempting to detonate the purported bomb inside the Vehicle, which was parked next to the New York Federal Reserve Bank.

II.   Procedural History

Nafis was arrested on October 17, 2012 shortly after attempting to trigger the purported bomb. On February 7, 2013, Nafis pleaded guilty before Your Honor to Count One of the Indictment, which charged him with attempting to use a weapon of mass destruction, in violation of Title 18, United States Code, Section 2332a(a). The Court sentenced Nafis on August 9, 2013. Prior to the Court imposing sentence, Nafis stated:

> THE DEFENDANT: I'm ashamed. I'm lost. I tried to do a terrible thing. I alone am responsible for all I have done. Please forgive me. I'm really ashamed that I believed the radicals now. I know it's wrong. It's wrong. I'm really grateful that the agents saved me. They treated me with real dignity.

(8/9/13 Sentencing Tr. at 39-40 (attached hereto as Exhibit A)). In imposing a sentence of 30 years' imprisonment, the Court stated:

> The seriousness of the offense to which this defendant entered his guilty plea is perhaps exceeded only by the offense he would have committed had this plot been successful. The defendant's goal was to detonate a thousand pounds of explosives outside of the Federal Reserve Bank, destroying that building, killing its inhabitants as well as the unfortunate men, women and children who may have been in the vicinity. Thankfully, in pursuing his goal, he encountered sources and an undercover agent of the Federal Bureau of Investigation. Indeed, today even the defendant purports to be grateful for that fact.
>
> I am persuaded that the defendant was a serious threat to the safety of New Yorkers, Americans and that he would have executed this plan or a similar, perhaps less grand one, had he not been discovered by the men and women of both our federal law enforcement and local law enforcement communities who work so tirelessly to protect us from plots fostered by the very type of blind hatred that influenced this defendant.

(8/9/13 Sentencing Tr. at 41).

The Court entered its Judgment on August 15, 2013. Nafis filed a notice of appeal on that same date, but subsequently withdrew the notice. On January 14, 2014, the Court of Appeals issued its mandate so ordering the stipulation withdrawing Nafis's appeal.

On May 11, 2018, Nafis submitted a petition pursuant to Title 28, United States Code, Section 2255, to have his conviction overturned or, in the alternative, to be resentenced.  (ECF #52).  He challenged his sentence on several grounds, including that his counsel provided ineffective assistance in violation of his Sixth Amendment rights, that his Fourth Amendments rights were violated by the government's decision to not arrest him sooner, and that the government encouraged him to increase the scope and nature of the destruction he planned.  On April 8, 2020, the Court denied his petition in its entirety.  (ECF #56).

On October 15, 2020, Nafis submitted the instant pro se application for a reduction in sentence.

III.    The Court Should Deny Nafis's Application for Early Release

In his instant application for early release, Nafis appears to argue that the Supreme Court's decision in Johnson v. United States, 576 U.S. 591 (2015), somehow undermined the legality of his sentence, and that therefore the Court should reduce his sentence pursuant to Title 18, United States Code, Section 3582(c)(1)(A).[2]

Because Nafis's argument appears to be based on a misunderstanding of Johnson and the relevant legal framework, and because Nafis cites to no extraordinary or compelling reason warranting a sentence reduction or undermining the Court's prior analysis of the sentencing factors set forth in Section 3553(a), the Court should deny his application in its entirety.

A.    Legal Framework

Under Section 3582, the Court "may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A).

The relevant Sentencing Commission policy statement provides that the Court may reduce the term of imprisonment if "extraordinary and compelling reasons warrant the reduction," U.S.S.G. § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," id. § 1B1.13(2); and "the reduction is consistent with this policy statement," id. § 1B1.13(3).

---

[2] On August 13, 2020, Nafis raised essentially this same argument in a request for early release submitted to the warden overseeing his Bureau of Prisons institution.  That request was denied on October 14, 2020.  Those documents are attached hereto as Exhibit B.

The Application Note describes the circumstances under which "extraordinary and compelling reasons exist":

(A) Medical Condition of the Defendant. —

(i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,
(II) suffering from a serious functional or cognitive impairment, or
(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant. — The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family circumstances. —

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons. — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in

combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 Application Note 1.

Regardless of the theory of "extraordinary and compelling reasons" under which a defendant proceeds, as noted above, the 18 U.S.C. § 3553(a) factors are relevant to whether release is warranted. See 18 U.S.C. § 3582; U.S.S.G. § 1B1.13.

The Guidelines and Bureau of Prisons ("BOP") policy have established clear criteria to aid in a court's determination of when compassionate release is appropriate pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). See U.S.S.G. § 1B1.13; see also BOP Program Statement 5050.50. Both the Guidelines and the BOP Program Statement primarily limit compassionate relief to cases of serious illness or impairment, advanced age or a need to care for a child, spouse or registered partner. See id.; see also United States v. Traynor, 04-CR-0582 (NGG), 2009 WL 368927, at *1 n.2 (E.D.N.Y. Feb. 13, 2009). As the court recognized in Traynor, Congress noted that Section 3582(c)(1) "applies . . . to the unusual case in which the defendant's circumstances are so changed, such as by terminal illness, that it would be inequitable to continue the confinement of the prisoner." Id. at *1 (citing Senate Report No. 98–225, 98th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 3182, 3304).[3]

As the proponent of release, the defendant bears the burden of proving that "extraordinary and compelling reasons" exist. See United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden

---

[3] In United States v. Zullo, No. 19-3218-CR (2d Cir. Sep. 25, 2020), the Court of Appeals held that a defendant seeking a sentencing reduction pursuant to 18 U.S.C. § 3582(c)(1)(A) must show an "extraordinary and compelling reason" for such a reduction, and clarified that the "extraordinary and compelling reason" need not be limited to circumstances identified in Application Note 1(D) of Section 1B1.13 of the United States Sentencing Guidelines Manual. (Attachment D at 3.) The court then "state[d] no opinion either way" on whether any of the factors identified by Zullo, such as his age, had even "possible relevance," and explained that consideration of Zullo's arguments were "best left to the sound discretion of the trial court." (Id. at 20.) The government respectfully submits that Zullo was wrongly decided and notes the District of Vermont filed a petition for rehearing en banc on November 9, 2020. As set forth in the government's brief to the Second Circuit in Zullo, in 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission the authority to define the term "extraordinary and compelling reasons." The First Step Act altered only the procedural mechanism in § 3582(c)(1) and did not revoke the authority delegated to the Commission in § 994(t), or purport to expand the basis for compassionate release beyond the categories identified by the Sentencing Commission in the application note to U.S.S.G. § 1B1.13. In any event, for the reasons set forth herein, Nafis has failed to identify "extraordinary and compelling reasons," even under Zullo.

of showing that the circumstances warrant that decrease."); <u>United States v. Gotti</u>, 02-CR-743 (CM), 2020 WL 497987, at *5 (S.D.N.Y. Jan. 15, 2020) (defendant "has the burden of showing that 'extraordinary and compelling reasons' to reduce his sentence exist").

    B.    <u>Discussion</u>

        At the outset, Nafis argues that the operative Sentencing Guideline for his offense of conviction, Section 2K1.4, "has been removed from the Guidelines" following the Supreme Court's decision in <u>Johnson</u>. (App. at 3). Nafis is mistaken. Section 2K1.4, the Guideline for "Property Damage by Use of Explosives," remains a valid provision of the operative 2018 Sentencing Guidelines. Further, to the extent that Nafis is arguing that Section 2K1.4(a), which refers to "substantial risk of death or serious bodily injury," was somehow invalidated by <u>Johnson</u>, this argument fails for at least two reasons. First, Nafis was not sentenced under Section 2K1.4(a); rather, the Court found that his base offense level was 33 pursuant to Section 2K1.4(c), which requires a cross-reference to Section 2A2.1(a)(1), the provision for first degree murder. Second, the Supreme Court held in <u>Beckles v. United States</u>, 137 S. Ct. 886 (2017), that the <u>Johnson</u> void-for-vagueness holding does not apply to the Sentencing Guidelines. As such, Nafis identifies – and there is – no legal defect to his sentence that would constitute an extraordinary or compelling basis for the Court to reduce that sentence.

        The remainder of Nafis's application rests on his argument that, because he was 21 years old at the time he committed the offense, he was "not functioning as an adult with an adult state of mind. But rather as a teenager, and today is remorseful and learned from his mistake." (App. at 9). Nafis appears to contend his age at the time he committed the offense is likewise an extraordinary or compelling basis justifying a sentence reduction.

        This argument likewise fails. At sentencing, Nafis – through counsel – made precisely this argument about his age and regret for his criminal conduct in advocating for a lesser sentence. (<u>See</u> 8/9/13 Sentencing Tr. at 21 ("Mr. Nafis is a young man. He's barely out of adolescence now. . . . He does not blame anybody else for his behavior. He's deeply ashamed of his behavior."). Because the Court has already taken these facts into account in crafting the sentence in this case, raising them again now is not an extraordinary or compelling basis for a sentence reduction. In addition, Nafis's recycled argument does not otherwise undermine the Court's original application of the sentencing factors set forth in Section 3553(a).

11

IV.    <u>Conclusion</u>

        Ultimately, Nafis has not and cannot show any basis under Section 3582 for the Court to reduce his sentence.  Moreover, there has been no change to the facts of his case that would undermine the Court's prior, careful analysis of the sentencing factors set forth in Title 18, United States Code, Section 3553(a).  Accordingly, Nafis's application for early release should be denied.

                Respectfully submitted,

                SETH D. DuCHARME
                Acting United States Attorney

By:          /s/
                Richard M. Tucker
                Assistant U.S. Attorney
                (718) 254-6204

Enclosures

cc:    Clerk of Court (CBA) (by ECF)
       Quazi Mohammad Rezwanul Ahsan Nafis (by US Mail)

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of this letter and the Court's order of October 16, 2020 have been filed with the Court and served by U.S. mail upon the defendant, Quazi Mohammad Rezwanul Ahsan Nafis, Register No. 81710-053, FCI EDGEFIELD FEDERAL CORRECTIONAL INSTITUTION P.O. BOX 725 EDGEFIELD, SC 29824, on the 13th day of November, 2020.

/s/ Richard M. Tucker
Richard M. Tucker
Assistant U.S. Attorney

13